## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **PARKER-HANNIFIN CORPORATION,** <br> **and PARKER INTANGIBLES, LLC,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No 1:07-cv-00266 - \*\*\*** |
| | : | |
| **v.** | : | |
| | : | |
| **SCHLEGEL ELECTRONIC MATERIALS,** <br> **INC.,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |
| | : | |
| **SCHLEGEL ELECTRONIC MATERIALS,** <br> **INC.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PARKER-HANNIFIN CORPORATION,** | : | |
| | : | |
| | : | |
| **Counter-Defendant.** | : | |
| _____ | : | |

### DEFENDANT SCHLEGEL ELECTRONIC MATERIALS'
### UNOPPOSED MOTION FOR LEAVE TO FILE
### AN AMENDED ANSWER AND COUNTERCLAIM

Defendant Schlegel Electronic Materials  ("Schlegel"), through counsel, hereby moves

the Court, pursuant to Fed.R.Civ.P. 15(a) , for leave to file and serve an Amended Answer and

Counterclaim, attached hereto as Exhibit 1.

A second copy ("Redlined") of this pleading "which … indicate[s] in what respect it differs from the pleading which it amends," as required by Local Rule 15.1, is attached hereto as Exhibit 2.

This motion is filed within the time frame set by the Court's Scheduling Order for motions to amend pleadings.  (D.I., 21, ¶ 2).

Schlegel conferred with counsel for Plaintiffs, as required under Local Rule 7.1.1, and Plaintiffs do not oppose this motion.

WHEREFORE, defendant requests leave to file the attached Amended Answer and Counterclaims.

Respectfully submitted, this 18th day of December, 2007.

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

**A Professional Limited Liability Company**

*/s/  James M. Lennon*
George Pazuniak (#478)
James M. Lennon (# 4570)
Anna Martina Tyreus (# 4771)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Tel:  (302) 252-4326
Fax:  (302) 661-7726
gpazuniak@wcsr.com
jlennon@wcsr.com
mtyreus@wcsr.com

*Attorneys for Schlegel Electronic Materials, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2007, I caused the foregoing motion and attached exhibits to be served upon the following in the manner so indicated:

### <u>VIA HAND DELIVERY AND EMAIL</u>
Steve Nash
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899

This 18th day of December, 2007.

*/s/  James M. Lennon*
James M. Lennon (DE # 4570)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PARKER-HANNIFIN CORPORATION, and PARKER INTANGIBLES, LLC     ) ) ) | |
| Plaintiff,     ) ) | |
| v.     ) ) | C.A. No. 1:07-cv-266 |
| SCHLEGEL ELECTRONIC MATERIALS, INC.,     ) ) ) | JURY TRIAL DEMANDED |
| Defendant.     ) | |
| SCHLEGEL ELECTRONIC MATERIALS, INC.,     ) ) ) | |
| Counterclaimant,     ) ) | |
| v.     ) ) | |
| PARKER-HANNIFIN CORPORATION,     ) ) | |
| Counter-Defendant.     ) | |

## AMENDED ANSWER AND COUNTERCLAIM OF DEFENDANT SCHLEGEL ELECTRONIC MATERIALS, INC.

Defendant Schlegel Electronic Materials, Inc. ("Schlegel") hereby answers the

Complaint of Plaintiff Parker-Hannifin Corporation and Parker Intangibles, LLC

(collectively "Parker") as follows:

1.      Schlegel lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 1 of the Complaint.

2.      Schlegel lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 2 of the Complaint.

3.      Schlegel denies that it is a corporation organized and existing under the laws of the State of New York, and denies that its principle place of business is 1555 Jefferson Road, but admits the remaining allegations contained in Paragraph 3 of the Complaint.

## JURISDICTION AND VENUE

4.      Schlegel admits subject matter jurisdiction of this Court as alleged in Paragraph 4 of the Complaint and waives objection to personal jurisdiction.

5.      Schlegel waives objection to venue of this Court as alleged in Paragraph 5 of the Complaint.

## PARKER-HANNIFIN'S PATENTS

6.      Schlegel admits that U.S. Patent No. 6,387,523 ("the '523 patent") issued on May 14, 2002, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '523 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 6 of the Complaint.

7.      Schlegel admits that U.S. Patent No. 6,521,348 ("the '348 patent") issued on February 18, 2003, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '348 patent.  Schlegel is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 7 of the Complaint.

8.      Schlegel admits that U.S. Patent No. 6,716,536 ("the '536 patent") issued on April 6, 2004, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '536 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in paragraph 8 of the Complaint.

9.      Schlegel admits that U.S. Patent No. 6,777,095 ("the '095 patent") issued on August 17, 2004, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '095 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 9 of the Complaint.

10.      Schlegel admits that U.S. Patent No. 6,248,393 ("the '393 patent") issued on June 19, 2001, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '393 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 10 of the Complaint.

## PARKER-HANNIFIN'S ALLEGATIONS OF INFRINGEMENT

11.      Schlegel denies each and every allegation of Paragraph 11 of the Complaint.

12.      Schlegel denies each and every allegation of Paragraph 12 of the Complaint.

## SCHLEGEL'S AFFIRMATIVE DEFENSES

13.      Upon information and belief, Schlegel has not infringed and is not infringing any claim of Parker's '523, '348, '536, '095, and '393 patents, either directly or by inducing or contributing to their infringement by others.

14.      Upon information and belief, the claims of Parker's '523, '348, '536, '095, and '393 patents are invalid for failure to satisfy the requirements of the United States patent laws, 35 U.S.C. §§ 101 et seq., including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

15.     Upon information and belief, Parker's '523, '348, '536, '095, and '393 patents are invalid as a result of obviousness-type double patenting.

16.     Upon information and belief, Parker is estopped by virtue of amendments and statements made during the course of prosecution of Parker's '523, '348, '536, '095, and '393 patents from obtaining any construction of the claims of these patents that could cover any of Schlegel's products and the methods by which those products are made.

17.     On information and belief, Parker and Parker Intangibles LLC have failed to comply with the provisions of 35 U.S.C. § 287(a) and are therefore barred from recovery of any damages prior to service of the Complaint.

18.     Upon information and belief, Parker's '523, '348, '536, '095, and '393 patents ("Parker Patents") are unenforceable, because of at least three instances of inequitable conduct by applicants in the United States Patent and Trademark Office ("PTO" or "Patent Office"), each of which separately, independently and collectively establishes a basis for unenforceability.  The particular bases for the inequitable conduct defenses are as follows:

   a.   Erma Cameron was the PTO examiner ("Examiner Cameron") for all of the applications leading to the Parker Patents (hereinafter called the applications leading to, and the resultant, Parker Patents are collectively referred to as the "Cameron Applications").

   b.   John A. Molnar, Jr. ("Molnar") was the prosecuting attorney for each of the Cameron Applications,

   c.   Michael H. Bunyan ("Bunyan") and William I. Flanders ("Flanders") are the named inventors in each of the Cameron Applications.

- 4 -

d.   Upon information and belief, Molnar, Bunyan, and Flanders were at all times during the prosecution of these applications employed by Parker Hannifin Corporation.

e.   The history and relationship of the Cameron Applications is as follows:

The '393 patent issued on June 19, 2001 as the result of patent application No. 09/250,338 filed on February 16, 1999 claiming priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '523 patent issued on May 14, 2002 as the result of patent application No. 09/883,785 filed on June 18, 2001 as a continuation of the above patent application No. 09/250,338 filed on February 16, 1999, now U.S. Pat. No. 6,248,393, and claiming priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '348 patent issued on February 18, 2003 as the result of patent application No. 10/142,803 filed on May 9, 2002 as a continuation of application No. 09/883,785, filed on June 18, 2001, now Pat. No. 6,387,523, which is a continuation of application No. 09/250,338, filed on February 16, 1999, now Pat. No. 6,428,393, which claims priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '536 patent issued April 6, 2004 as the result of patent application No. 10/318,609 filed on December 11, 2002 as a continuation of application No. 10/142,803, filed on May 9, 2002, now Pat. No. 6,521,348, which is a continuation of application No. 09/883,785, filed on June 18, 2001, now Pat. No. 6,387,523, which is a continuation of application No. 09/250,338, filed on February 16, 1999, now Pat. No. 6,248,393, which claims priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '095 patent issued August 17, 2004 as the result of patent application No.

10/753,016 filed on January 7, 2004 as a continuation of application No. 10/318,609,

filed on December 11, 2002, now Pat. No. 6,716,536, which is a continuation of

application No. 10/142,803, filed on May 9, 2002, now Pat. No. 6,521,348, which is a

continuation of application No. 09/883,785, filed on June 18, 2001, now Pat. No.

6,387,523, which is a continuation of application No. 09/250,338, filed on February 16,

1999, now Pat. No. 6,248,393, which claims priority from provisional application No.

60/076,370 filed on February 27, 1998.

The application sequence is shown in the following chart:

```
┌─────────────────────────────────────────────┐
│  Provisional Patent App. Serial No. 60/076,370 │
│              Filed Feb. 27, 1998              │
└─────────────────────────────────────────────┘
                   (converted)
┌─────────────────────────────────────────────┐
│     Patent App. Serial No. 09/250,338         │
│              Filed Feb. 16, 1999              │
│     (issued as '393 patent on June 19, 2001)  │
└─────────────────────────────────────────────┘
                  (continuation)
┌─────────────────────────────────────────────┐
│     Patent App. Serial No. 09/883,785         │
│              Filed June 18, 2001              │
│     (issued as '523 patent on May 14, 2002)   │
└─────────────────────────────────────────────┘
                  (continuation)
┌─────────────────────────────────────────────┐
│     Patent App. Serial No. 10/142,803         │
│               Filed May 9, 2002               │
│     (issued as '348 patent on Feb. 18, 2003)  │
└─────────────────────────────────────────────┘
                  (continuation)
┌─────────────────────────────────────────────┐
│     Patent App. Serial No. 10/318,609         │
│              Filed Dec. 11, 2002              │
│     (issued as '536 patent on Apr. 6, 2004)   │
└─────────────────────────────────────────────┘
                  (continuation)
┌─────────────────────────────────────────────┐
│     Patent App. Serial No. 10/753,016         │
│               Filed Jan. 7, 2004              │
│     (issued as '095 patent on Aug. 17, 2004)  │
└─────────────────────────────────────────────┘
```

f.   At the time the first Cameron Application was filed, the PTO regulations,

37 C.F.R. § 1.56 (1992), provided in part, as follows:

Section 1.56  Duty to disclose information material to patentability.

(a)  A patent by its very nature is affected with a public interest.  The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability.  Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.  The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned.  Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application.  There is no duty to submit information which is not material to the patentability of any existing claim.  The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by Secs. 1.97(b)-(d) and 1.98.  However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct.  The Office encourages applicants to carefully examine:
        (1)  Prior art cited in search reports of a foreign patent office in a counterpart application, and
        (2)  The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b)  Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
        (1)  It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
        (2)  It refutes, or is inconsistent with, a position the applicant takes in:
        (i)  Opposing an argument of unpatentability relied on by the Office, or
        (ii)  Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c)  Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:
      (1)  Each inventor named in the application;
      (2)  Each attorney or agent who prepares or prosecutes the application; and
      (3)  Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. (d)  Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

      g.   The above provisions of Rule 56 continue to this day, and Rule 56 has been amended only to add an additional sub-section (e) [65 FR 54666, Sept. 8, 2000], which provides:

(e)  In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

      h.   Hereinafter, the terms "Applicant" or "Applicants" means anyone under a duty to disclose material information to the PTO pursuant to 37 C.F.R. § 1.56, including Molnar, Bunyan, Flanders and any other person substantively involved in the preparation or prosecution of one or more of the Cameron Applications.

      i.   On October 22, 1998, in addition to the Cameron Applications, Applicants filed provisional application No. 60/105,271.  This provisional was converted into application No. 09/412,059 on October 4, 1999.  The prosecuting attorney on behalf of Parker was Molnar and the named inventor is Bunyan.  The PTO examiner for these

applications was Duc Truong (Examiner Truong).  This application issued on June 25, 2002 as U.S. Patent No. 6,410,137 ("the '137 Patent").  Collectively this provisional, the converted application, and the '137 Patent will be referred to hereinafter as "Truong Application."

       j.   The timeline of the Applicants' Cameron and Truong Applications is as follows:

| Cameron Applications Timeline | Truong Application Timeline |
|---|---|
| Feb. 27, 1998<br>Filed Provisional Patent App.<br>Serial No. 60/076,370 | |
| | Oct. 22, 1998<br>Filed Provisional Patent App.<br>Serial No. 60/105,271 |
| Feb. 16, 1999<br>Patent App. Serial No. 09/250,338<br>(issued as '393 patent on June 19, 2001) | |
| | Oct. 4, 1999<br>Patent App. Serial No. 09/250,338<br>(issued as '393 patent on June 25, 2002) |
| June 18, 2001<br>Filed Continuation Patent App.<br>Serial No. 09/883,785<br>(issued as '523 patent on May 14, 2002) | |
| May 9, 2002<br>Filed continuation Patent App.<br>Serial No. 10/142,803<br>(issued as '348 patent on Feb. 18, 2003) | |
| Dec. 11, 2002<br>Filed continuation Patent App.<br>Serial No. 10/318,609<br>(issued as '536 patent on Apr. 6, 2004) | |
| Jan. 7, 2004<br>Filed continuation Patent App.<br>Serial No. 10/753,016<br>(issued as '095 patent on Aug. 17, 2004) | |

k.   The Truong Application, as filed October 22, 1998 characterized the

invention as follows:

> [T]he present invention is directed to an intumescent, flame-retardant
> pressure-sensitive adhesive (PSA) composition particularly adapted for
> use in foil or fabric-over-foam EMI shielding gasket constructions for
> bonding an electrically-conductive foam or fabric sheath or jacket to a
> polyurethane or other foam core. … Gaskets of such construction
> advantageously have been observed to achieve a UL94 rating of V-0 over
> a range of cross-section

('137 patent, Col 3 lines 27-42).

l.   The above statement of the invention from the Truong Application is

nearly identical to the statement of the invention from the Cameron Applications:

> The present invention is directed to an electrically-conductive, flame
> retardant material for use in fabric-over-foam EMI shielding gaskets, and
> to a method of manufacturing the same.  In having a layer of a flame
> retardant coating applied to one side of an electrically-conductive,
> generally porous fabric, the material of the invention affords UL94 V-0
> protection when used as a jacketing in a fabric-over-foam gasket
> construction.

('393 patent, Col 3 lines 25-32).

m.   The Cameron Applications define "flame retardant" gaskets as those

"achieving a rating of V-0 under UL Std. No. 94, 'Tests for Flammability of Plastic

Materials for Parts in Devices and Appliances' (1991)"

n.   The Truong and Cameron Applications are both directed to an EMI

shielding material that meets the Underwriters Laboratory 94 V-0 vertical burn rating

standard for flame retardance ("UL 94 V-0") by applying a layer with flame retardant

additives between an exterior conductive fabric/sheath and an interior foam core.

o.   This similarity, standing alone, makes the Truong Application material

information to the prosecution of the Cameron Applications that should have been

disclosed to the PTO.

p.   Upon information and belief, the existence of the co-pending Truong

Application was never disclosed to Examiner in the Cameron Applications.

q.   The Truong Application further discloses that  a "unique combination of

flame retardant additives" is required to achieve a rating of V-0 under UL Std. No. 94.

The three components of this mixture are:

> "a halogenated first flame retardant component, an metal oxide-based
> second flame retardant component, and a filler component of expandable,
> intercalated graphite particles."

('137 patent, Col 3 lines 52-55).

r.   The Truong Application further teaches that it was "unexpected" that this

three-part mixture was "critical" to achieve a UL 94 V-0 rating:

> [t]he … results confirm that the EMI shielding material of the present
> invention is UL94 V-0 compliant when used as a jacketing in a fabric-
> over-foam gasket construction.  Unexpectedly, it was found that the use of
> a unique combination of three different flame retardant additives was
> critical in the use of any of the additives alone or without one of the other
> additives was insufficient to meet the required UL-V0 criteria.

('137 patent, Col. 12 lines 21-28).  On January 25, 2002, Molnar filed an

Amendment and Response in which he distinguished certain prior art on the sole

basis that the prior art did not disclose the graphite component and further argued,

as a basis for patentability, that:

> [u]nexpectedly, it has been observed that such flame retardant additive
> combination functions synergistic.  In this regard, each of the components
> separately has been observed not to impart flame retardancy to the PSA
> composition effective to achieve UL 94 V-0 protection within a fabric or
> foil over foam EMI shielding gasket construction.

s.   The above representation in the Truong Application manifests that

Applicants not only knew that a special three-part mixture was critical to achieving a UL-

V0 rating, but that Applicants possessed test data and results, as of October 22, 1998,

- 11 -

which demonstrated that halogenated or metal-oxide based flame retardant additives in the interior layer between the fabric/sheath and foam, individually or in combination with each other, were insufficient to produce a product meeting the UL 94 V-0 criteria. The above data and results identified in the Truong Application is hereafter referred to as the "Test Results."

       t.   Despite the representation in the Truong Application that a graphite-based chemical mixture of flame retardant additives was necessary to achieve a V-0 rating, the Applicant's subsequent February 16, 1999 application, Serial No. 09/250,338, and subsequent Cameron Applications do not mention graphite and do not disclose that graphite was necessary to achieve a V-0 rating. In direct contradiction to their representations in the Truong Application, the Applicants represented in the Cameron Applications that only a single flame retardant additive was required to obtain the preferred results:

> Flame retardancy may be imparted by loading the emulsion with … one or more conventional flame retardant additives such as aluminum hydrate, antimony trioxide, phosphate esters, or halogenated compounds such as polybrominated diphenyl oxides.

('393 patent, Col. 6 lines 59-63).

       u.   Further, despite Applicant's representation in the Truong Application regarding Applicant's Test Results, their subsequent February 16, 1999 application, Serial No. 09/250,338, and subsequent Cameron Applications do not disclose that formulations without graphite failed to achieve a V-0 rating.

       v.   The Test Results are inconsistent with the Cameron Applications that describe "preferred formulations" without mentioning either graphite or that a three-part formulation was critical for UL-V0 rating. The Test Results were undisclosed even

though the Cameron Applications included at least three issued claims directed to the

chemical composition of the interior layer:

> wherein said one or more flame retardant additives are selected from the
> group consisting of aluminum hydrate, antimony trioxide, phosphate
> esters, and halogenated compounds

('348 patent claim 18; '536 patent claim 9; and '095 patent claim 9).

      w.  The disclosure of the three-part formulation in the Truong Application and

the Test Results should have been disclosed to the Examiner in the Cameron

Applications, because such information would have been considered important by a

reasonable examiner in determining issues of patentability, including whether Applicants

had met the enablement and best mode requirements of 35 U.S.C. §112.

      x.  In an August 7, 2001 Office Action in the Truong Application, The Patent

Office rejected all pending claims in view of a prior art patent to Petras, U.S. Patent No.

4,061,826 (hereinafter "the Petras Prior Art").  The Petras Prior Art discloses the use of

both halogenated and a metal oxide flame retardant additives in a coating to impart flame

retardance to an EMI shielding material.  Examiner Truong explained:

> Claims 1-27 are rejected under 35 U.S.C. § 103(a) as being unpatentable
> over Petras et al in view of Krassowski … Petras discloses halogen
> containing flame retardant pressure sensitive adhesive tapes can be used to
> cover certain magnet wire wound components of electrical or electronic
> equipment. … The reference further discloses othe [sic] additives … such
> as antimony oxide.

On January 25, 2002, Molnar filed an Amendment and Response in which he

distinguished the Petras Prior Art on the sole basis that it does not disclose the graphite

component of the flame-retardant composition.

      y.  In view of the fact that another examiner had rejected claims in a related

application based on the Petras Prior Art, Petras was clearly material information to the

prosecution of the Cameron Applications that should have been disclosed to the PTO. Petras was not cumulative to any other information before the Examiner, and it discloses EMI shielding material with flame retardance imparted by a coating that includes halogenated and metal oxides flame retardant additives as claimed in at least some of the pending and issued claims of the Cameron Applications..

z.   The Petras Prior Art was never disclosed in the Cameron Applications.

aa.  Despite the materiality of the Truong Application, the Test Results, and the Petras Prior Art, Applicants did not disclose this material information.  Upon information and belief, Applicants failures to disclose the Truong Application, the Test Results, and the Petras Prior Art, were done with deceptive intent, or, at least, with such gross negligence as to be equivalent to deceptive intent.

bb.  Each of the Parker Patents is unenforceable in view of the conduct set forth above.  Each of the breaches of the Applicants' duty of good faith and candor, individually and collectively, constitute a basis for rendering unenforceable each of the Parker Patents, and the totality of Applicants' conduct demonstrates inequitable conduct. Each Parker Patent after the first is further unenforceable in view of the infectious unenforceability of the inequitable conduct during the course of the prosecution of the Cameron Applications.

## RESERVATION OF RIGHTS

19.    Schlegel is still investigating this matter and has not yet had an opportunity to conduct any discovery, and therefore reserves the right to raise such additional defenses as may be appropriate upon further investigation and discovery.

## <u>COUNTERCLAIM</u>

Counterclaimant, Schlegel Electronic Materials, Inc. ("Schlegel"), as and for its

- 14 -

counterclaim against counter-defendant, Parker-Hannifin Corporation ("Parker"), hereby alleges as follows:

20.     Schlegel is a corporation organized and existing under the laws of the State of Delaware, having its principle place of business at 806 Linden Avenue, Suite 100, Rochester, New York 14602.

21.     As Parker admits in paragraph 1 of its complaint, Parker is a corporation organized and existing under the laws of the State of Ohio having a principal place of business at 6035 Parkland Blvd., Cleveland Ohio.

## JURISDICTION AND VENUE

22.     As Parker admits in paragraph 3 of its complaint, jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Jurisdiction over the declaratory judgment counterclaims is also proper under 28 U.S.C. § 2201.

23.     As Parker admits in paragraph 4 of its complaint, venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

## SCHLEGEL'S PATENTS

24.     On September 3, 1991, United States Letter Patent No. 5,045,635 (the '635 patent) (attached hereto as Exhibit "A") was duly and legally issued.  The '635 patent is owned by Schlegel.

25.     On April 14, 1992, United States Letter Patent No. 5,105,056 (the '056 patent) (attached hereto as Exhibit "B") was duly and legally issued.  The '056 patent is owned by Schlegel.

## SCHLEGEL'S ALLEGATIONS OF INFRINGEMENT

26.     Parker has been and still is infringing one or more claims of the '635 patent.

- 15 -

27.     Parker has been and still is infringing one or more claims of the '056 patent.

28.     Parker's infringing activities have included direct infringement, contributory infringement and/or active inducement of infringement within the meaning of 35 U.S.C. §§ 271(a) through (c).

29.     Parker has committed the acts of infringement in disregard of Schlegel's rights in Schlegel's '635 and '056 patents.  Upon information and belief, Parker's infringement has been willful, deliberate and intentional, and will continue, to Schlegel's irreparable harm, unless enjoined by this Court.

## DECLARATION OF INVALIDTY

30.     Upon information and belief, the claims of Parker's '523, '348, '536, '095, and '393 patents are invalid for failure to satisfy the requirements of the United States patent laws, 35 U.S.C. §§ 101 et seq., including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

## DECLARATION OF UNENFORCEABILITY

31.     Upon information and belief, the Parker Patents are unenforceable for the reasons detailed in ¶ 18 of the Affirmative Defense set forth above and incorporated here by reference.

**WHEREFORE**, Schlegel prays as follows:

A.  That Parker take nothing by reason of its Complaint, and that judgment be entered for Schlegel;

B.  That Parker's '523, '348, '536, '095, and '393 patents and each and every claim thereof be adjudged to be and declared invalid and unenforceable, and that Schlegel be adjudged not to infringe such patent;

C.  That the Court declare this an exceptional case and award Schlegel its attorneys' fees and costs pursuant to 35 U.S.C. § 285;

D.  That Parker has infringed Schlegel's  '635 and '056 patents;

E.  That Parker be permanently enjoined from further conduct which infringes Schlegel's  '635 and '056 patents;

F.  That Schlegel be awarded damages adequate to compensate it for Parker's infringement, and that the damages be trebled because of the willful nature of Parker's infringement, together with interest, pursuant to 35 U.S.C. § 284; and

G.  That the Court grant such other and further relief as is just and proper.

Dated:  December 18, 2007                WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

                                         By:   _s/ George Pazuniak_____
                                              George Pazuniak (DE # 478)
                                              James M. Lennon (DE # 4570)
                                              Martina Tyreus (DE # 4771)
                                              222 Delaware Avenue, Suite 1501
                                              Wilmington, DE 19801
                                              (302) 252-4320

*Of Counsel:*
Dan O'Brien, Esq.
Woods Oviatt Gilman LLP
700 Crossroads Bldg
2 State Street
Rochester, NY 14614

                                         *Attorneys for Defendant/Counterclaimant*
                                         *SCHLEGEL ELECTRONIC MATERIALS, INC.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PARKER-HANNIFIN CORPORATION, and PARKER INTANGIBLES, LLC )<br><br>Plaintiff, )<br><br>v. )<br><br>SCHLEGEL ELECTRONIC MATERIALS, INC., )<br><br>Defendant. )<br><br>SCHLEGEL ELECTRONIC MATERIALS, INC., )<br><br>Counterclaimant, )<br><br>v. )<br><br>PARKER-HANNIFIN CORPORATION, )<br><br>Counter-Defendant. ) | C.A. No. 1:07-cv-266<br><br>JURY TRIAL DEMANDED |

## AMENDED ANSWER AND COUNTERCLAIM OF DEFENDANT SCHLEGEL ELECTRONIC MATERIALS, INC.

Defendant Schlegel Electronic Materials, Inc. ("Schlegel") hereby answers the

Complaint of Plaintiff Parker-Hannifin Corporation and Parker Intangibles, LLC

(collectively "Parker") as follows:

1. Schlegel lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 1 of the Complaint.

2. Schlegel lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 2 of the Complaint.

3.      Schlegel denies that it is a corporation organized and existing under the laws of the State of New York, and denies that its principle place of business is 1555 Jefferson Road, but admits the remaining allegations contained in Paragraph 3 of the Complaint.

## JURISDICTION AND VENUE

4.      Schlegel admits subject matter jurisdiction of this Court as alleged in Paragraph 4 of the Complaint and waives objection to personal jurisdiction.

5.      Schlegel waives objection to venue of this Court as alleged in Paragraph 5 of the Complaint.

## PARKER-HANNIFIN'S PATENTS

6.      Schlegel admits that U.S. Patent No. 6,387,523 ("the '523 patent") issued on May 14, 2002, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '523 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 6 of the Complaint.

7.      Schlegel admits that U.S. Patent No. 6,521,348 ("the '348 patent") issued on February 18, 2003, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '348 patent.  Schlegel is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 7 of the Complaint.

8.      Schlegel admits that U.S. Patent No. 6,716,536 ("the '536 patent") issued on April 6, 2004, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '536 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in paragraph 8 of the Complaint.

9.      Schlegel admits that U.S. Patent No. 6,777,095 ("the '095 patent") issued on August 17, 2004, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '095 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 9 of the Complaint.

10.     Schlegel admits that U.S. Patent No. 6,248,393 ("the '393 patent") issued on June 19, 2001, but denies that it was duly and legally issued.  Schlegel denies that Parker has standing to assert the '393 patent.  Schlegel is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 10 of the Complaint.

## PARKER-HANNIFIN'S ALLEGATIONS OF INFRINGEMENT

11.     Schlegel denies each and every allegation of Paragraph 11 of the Complaint.

12.     Schlegel denies each and every allegation of Paragraph 12 of the Complaint.

## SCHLEGEL'S AFFIRMATIVE DEFENSES

13.     Upon information and belief, Schlegel has not infringed and is not infringing any claim of Parker's '523, '348, '536, '095, and '393 patents, either directly or by inducing or contributing to their infringement by others.

14.     Upon information and belief, the claims of Parker's '523, '348, '536, '095, and '393 patents are invalid for failure to satisfy the requirements of the United States patent laws, 35 U.S.C. §§ 101 et seq., including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

15.     Upon information and belief, Parker's '523, '348, '536, '095, and '393 patents are invalid as a result of obviousness-type double patenting.

16.     Upon information and belief, Parker is estopped by virtue of amendments and statements made during the course of prosecution of Parker's '523, '348, '536, '095, and '393 patents from obtaining any construction of the claims of these patents that could cover any of Schlegel's products and the methods by which those products are made.

17.     On information and belief, Parker and Parker Intangibles LLC have failed to comply with the provisions of 35 U.S.C. § 287(a) and are therefore barred from recovery of any damages prior to service of the Complaint.

18.     Upon information and belief, Parker's '523, '348, '536, '095, and '393 patents ("Parker Patents") are unenforceable, because of at least three instances of inequitable conduct by applicants in the United States Patent and Trademark Office ("PTO" or "Patent Office"), each of which separately, independently and collectively establishes a basis for unenforceability.  The particular bases for the inequitable conduct defenses are as follows:

a.   Erma Cameron was the PTO examiner ("Examiner Cameron") for all of the applications leading to the Parker Patents (hereinafter called the applications leading to, and the resultant, Parker Patents are collectively referred to as the "Cameron Applications").

b.   John A. Molnar, Jr. ("Molnar") was the prosecuting attorney for each of the Cameron Applications,

c.   Michael H. Bunyan ("Bunyan") and William I. Flanders ("Flanders") are the named inventors in each of the Cameron Applications.

d.   Upon information and belief, Molnar, Bunyan, and Flanders were at all times during the prosecution of these applications employed by Parker Hannifin Corporation.

e.   The history and relationship of the Cameron Applications is as follows:

The '393 patent issued on June 19, 2001 as the result of patent application No. 09/250,338 filed on February 16, 1999 claiming priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '523 patent issued on May 14, 2002 as the result of patent application No. 09/883,785 filed on June 18, 2001 as a continuation of the above patent application No. 09/250,338 filed on February 16, 1999, now U.S. Pat. No. 6,248,393, and claiming priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '348 patent issued on February 18, 2003 as the result of patent application No. 10/142,803 filed on May 9, 2002 as a continuation of application No. 09/883,785, filed on June 18, 2001, now Pat. No. 6,387,523, which is a continuation of application No. 09/250,338, filed on February 16, 1999, now Pat. No. 6,428,393, which claims priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '536 patent issued April 6, 2004 as the result of patent application No. 10/318,609 filed on December 11, 2002 as a continuation of application No. 10/142,803, filed on May 9, 2002, now Pat. No. 6,521,348, which is a continuation of application No. 09/883,785, filed on June 18, 2001, now Pat. No. 6,387,523, which is a continuation of application No. 09/250,338, filed on February 16, 1999, now Pat. No. 6,248,393, which claims priority from provisional application No. 60/076,370 filed on February 27, 1998.

The '095 patent issued August 17, 2004 as the result of patent application No.

10/753,016 filed on January 7, 2004 as a continuation of application No. 10/318,609,

filed on December 11, 2002, now Pat. No. 6,716,536, which is a continuation of

application No. 10/142,803, filed on May 9, 2002, now Pat. No. 6,521,348, which is a

continuation of application No. 09/883,785, filed on June 18, 2001, now Pat. No.

6,387,523, which is a continuation of application No. 09/250,338, filed on February 16,

1999, now Pat. No. 6,248,393, which claims priority from provisional application No.

60/076,370 filed on February 27, 1998.

The application sequence is shown in the following chart:

```
┌─────────────────────────────────────────┐
│ Provisional Patent App. Serial No. 60/076,370 │
│            Filed Feb. 27, 1998            │
└─────────────────────────────────────────┘
                (converted)
┌─────────────────────────────────────────┐
│    Patent App. Serial No. 09/250,338     │
│            Filed Feb. 16, 1999           │
│  (issued as '393 patent on June 19, 2001) │
└─────────────────────────────────────────┘
               (continuation)
┌─────────────────────────────────────────┐
│    Patent App. Serial No. 09/883,785     │
│            Filed June 18, 2001           │
│   (issued as '523 patent on May 14, 2002) │
└─────────────────────────────────────────┘
               (continuation)
┌─────────────────────────────────────────┐
│    Patent App. Serial No. 10/142,803     │
│             Filed May 9, 2002            │
│   (issued as '348 patent on Feb. 18, 2003) │
└─────────────────────────────────────────┘
               (continuation)
┌─────────────────────────────────────────┐
│    Patent App. Serial No. 10/318,609     │
│            Filed Dec. 11, 2002           │
│   (issued as '536 patent on Apr. 6, 2004) │
└─────────────────────────────────────────┘
               (continuation)
┌─────────────────────────────────────────┐
│    Patent App. Serial No. 10/753,016     │
│             Filed Jan. 7, 2004           │
│   (issued as '095 patent on Aug. 17, 2004) │
└─────────────────────────────────────────┘
```

f.   At the time the first Cameron Application was filed, the PTO regulations,

37 C.F.R. § 1.56 (1992), provided in part, as follows:

Section 1.56  Duty to disclose information material to patentability.

(a)  A patent by its very nature is affected with a public interest.  The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability.  Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.  The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned.  Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application.  There is no duty to submit information which is not material to the patentability of any existing claim.  The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by Secs. 1.97(b)-(d) and 1.98.  However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct.  The Office encourages applicants to carefully examine:
          (1)  Prior art cited in search reports of a foreign patent office in a counterpart application, and
          (2)  The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b)  Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
          (1)  It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
          (2)  It refutes, or is inconsistent with, a position the applicant takes in:
          (i)  Opposing an argument of unpatentability relied on by the Office, or
          (ii)  Asserting an argument of patentability.

- 7 -

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c)  Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:
     (1)  Each inventor named in the application;
     (2)  Each attorney or agent who prepares or prosecutes the application; and
     (3)  Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. (d)  Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

        g.   The above provisions of Rule 56 continue to this day, and Rule 56 has been amended only to add an additional sub-section (e) [65 FR 54666, Sept. 8, 2000], which provides:

        (e)  In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

        h.   Hereinafter, the terms "Applicant" or "Applicants" means anyone under a duty to disclose material information to the PTO pursuant to 37 C.F.R. § 1.56, including Molnar, Bunyan, Flanders and any other person substantively involved in the preparation or prosecution of one or more of the Cameron Applications.

        i.   On October 22, 1998, in addition to the Cameron Applications, Applicants filed provisional application No. 60/105,271.  This provisional was converted into application No. 09/412,059 on October 4, 1999.  The prosecuting attorney on behalf of Parker was Molnar and the named inventor is Bunyan.  The PTO examiner for these

- 8 -

applications was Duc Truong (Examiner Truong).  This application issued on June 25, 2002 as U.S. Patent No. 6,410,137 ("the '137 Patent").  Collectively this provisional, the converted application, and the '137 Patent will be referred to hereinafter as "Truong Application."

j.    The timeline of the Applicants' Cameron and Truong Applications is as follows:

| Cameron Applications Timeline | Truong Application Timeline |
|---|---|
| Feb. 27, 1998<br>Filed Provisional Patent App.<br>Serial No. 60/076,370 | |
| | Oct. 22, 1998<br>Filed Provisional Patent App.<br>Serial No. 60/105,271 |
| Feb. 16, 1999 | |
| Patent App. Serial No. 09/250,338<br>(issued as '393 patent on June 19, 2001) | |
| | Oct. 4, 1999 |
| | Patent App. Serial No. 09/250,338<br>(issued as '393 patent on June 25, 2002) |
| June 18, 2001<br>Filed Continuation Patent App.<br>Serial No. 09/883,785<br>(issued as '523 patent on May 14, 2002) | |
| May 9, 2002<br>Filed continuation Patent App.<br>Serial No. 10/142,803<br>(issued as '348 patent on Feb. 18, 2003) | |
| Dec. 11, 2002<br>Filed continuation Patent App.<br>Serial No. 10/318,609<br>(issued as '536 patent on Apr. 6, 2004) | |
| Jan. 7, 2004<br>Filed continuation Patent App.<br>Serial No. 10/753,016 | |



(issued as '095 patent on Aug. 17, 2004)

    k.  The Truong Application, as filed October 22, 1998characterized the

invention as follows:

> [T]he present invention is directed to an intumescent, flame-retardant
> pressure-sensitive adhesive (PSA) composition particularly adapted for
> use in foil or fabric-over-foam EMI shielding gasket constructions for
> bonding an electrically-conductive foam or fabric sheath or jacket to a
> polyurethane or other foam core. … Gaskets of such construction
> advantageously have been observed to achieve a UL94 rating of V-0 over
> a range of cross-section

('137 patent, Col 3 lines 27-42).

    l.  The above statement of the invention from the Truong Application is

nearly identical to the statement of the invention from the Cameron Applications:

> The present invention is directed to an electrically-conductive, flame retardant material for use in fabric-over-foam EMI shielding gaskets, and to a method of manufacturing the same. In having a layer of a flame retardant coating applied to one side of an electrically-conductive, generally porous fabric, the material of the invention affords UL94 V-0 protection when used as a jacketing in a fabric-over-foam gasket construction.

('393 patent, Col 3 lines 25-32).

m. The Cameron Applications define "flame retardant" gaskets as those "achieving a rating of V-0 under UL Std. No. 94, 'Tests for Flammability of Plastic Materials for Parts in Devices and Appliances' (1991)"

n. The Truong and Cameron Applications are both directed to an EMI shielding material that meets the Underwriters Laboratory 94 V-0 vertical burn rating standard for flame retardance ("UL 94 V-0") by applying a layer with flame retardant additives between an exterior conductive fabric/sheath and an interior foam core.

o. This similarity, standing alone, makes the Truong Application material information to the prosecution of the Cameron Applications that should have been disclosed to the PTO.

p. Upon information and belief, the existence of the co-pending Truong Application was never disclosed to Examiner in the Cameron Applications.

q. The Truong Application further discloses that a "unique combination of flame retardant additives" is required to achieve a rating of V-0 under UL Std. No. 94. The three components of this mixture are:

> "a halogenated first flame retardant component, an metal oxide-based second flame retardant component, and a filler component of expandable, intercalated graphite particles."

('137 patent, Col 3 lines 52-55).

- 11 -

r.   The Truong Application further teaches that it was "unexpected" that this three-part mixture was "critical" to achieve a UL 94 V-0 rating:

> [t]he … results confirm that the EMI shielding material of the present invention is UL94 V-0 compliant when used as a jacketing in a fabric-over-foam gasket construction.  Unexpectedly, it was found that the use of a unique combination of three different flame retardant additives was critical in the use of any of the additives alone or without one of the other additives was insufficient to meet the required UL-V0 criteria.

('137 patent, Col. 12 lines 21-28).  On January 25, 2002, Molnar filed an Amendment and Response in which he distinguished certain prior art on the sole basis that the prior art did not disclose the graphite component and further argued, as a basis for patentability, that:

> [u]nexpectedly, it has been observed that such flame retardant additive combination functions synergistic.  In this regard, each of the components separately has been observed not to impart flame retardancy to the PSA composition effective to achieve UL 94 V-0 protection within a fabric or foil over foam EMI shielding gasket construction.

s.   The above representation in the Truong Application manifests that Applicants not only knew that a special three-part mixture was critical to achieving a UL-V0 rating, but that Applicants possessed test data and results, as of October 22, 1998, which demonstrated that halogenated or metal-oxide based flame retardant additives in the interior layer between the fabric/sheath and foam, individually or in combination with each other, were insufficient to produce a product meeting the UL 94 V-0 criteria.  The above data and results identified in the Truong Application is hereafter referred to as the "Test Results."

t.   Despite the representation in the Truong Application that a graphite-based chemical mixture of flame retardant additives was necessary to achieve a V-0 rating, the Applicant's subsequent February 16, 1999 application, Serial No. 09/250,338, and

subsequent Cameron Applications do not mention graphite and do not disclose that graphite was necessary to achieve a V-0 rating.  In direct contradiction to their representations in the Truong Application, the Applicants represented in the Cameron Applications that only a single flame retardant additive was required to obtain the preferred results:

> Flame retardancy may be imparted by loading the emulsion with … one or more conventional flame retardant additives such as aluminum hydrate, antimony trioxide, phosphate esters, or halogenated compounds such as polybrominated diphenyl oxides.

('393 patent, Col. 6 lines 59-63).

u.   Further, despite Applicant's representation in the Truong Application regarding Applicant's Test Results, their subsequent February 16, 1999 application, Serial No. 09/250,338, and subsequent Cameron Applications do not disclose that formulations without graphite failed to achieve a V-0 rating.

v.   The Test Results are inconsistent with the Cameron Applications that describe "preferred formulations" without mentioning either graphite or that a three-part formulation was critical for UL-V0 rating.  The Test Results were undisclosed even though the Cameron Applications included at least three issued claims directed to the chemical composition of the interior layer:

> wherein said one or more flame retardant additives are selected from the group consisting of aluminum hydrate, antimony trioxide, phosphate esters, and halogenated compounds

('348 patent claim 18; '536 patent claim 9; and '095 patent claim 9).

w.  The disclosure of the three-part formulation in the Truong Application and the Test Results should have been disclosed to the Examiner in the Cameron Applications, because such information would have been considered important by a

reasonable examiner in determining issues of patentability, including whether Applicants had met the enablement and best mode requirements of 35 U.S.C. §112.

       x.   In an August 7, 2001 Office Action in the Truong Application, The Patent Office rejected all pending claims in view of a prior art patent to Petras, U.S. Patent No. 4,061,826 (hereinafter "the Petras Prior Art").  The Petras Prior Art discloses the use of both halogenated and a metal oxide flame retardant additives in a coating to impart flame retardance to an EMI shielding material.  Examiner Truong explained:

> Claims 1-27 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Petras et al in view of Krassowski … Petras discloses halogen containing flame retardant pressure sensitive adhesive tapes can be used to cover certain magnet wire wound components of electrical or electronic equipment. … The reference further discloses othe [sic] additives … such as antimony oxide.

On January 25, 2002, Molnar filed an Amendment and Response in which he distinguished the Petras Prior Art on the sole basis that it does not disclose the graphite component of the flame-retardant composition.

       y.   In view of the fact that another examiner had rejected claims in a related application based on the Petras Prior Art, Petras was clearly material information to the prosecution of the Cameron Applications that should have been disclosed to the PTO. Petras was not cumulative to any other information before the Examiner, and it discloses EMI shielding material with flame retardance imparted by a coating that includes halogenated and metal oxides flame retardant additives as claimed in at least some of the pending and issued claims of the Cameron Applications..

       z.   The Petras Prior Art was never disclosed in the Cameron Applications.

       aa. Despite the materiality of the Truong Application, the Test Results, and the Petras Prior Art, Applicants did not disclose this material information.  Upon

information and belief, Applicants failures to disclose the Truong Application, the Test Results, and the Petras Prior Art, were done with deceptive intent, or, at least, with such gross negligence as to be equivalent to deceptive intent.

bb. Each of the Parker Patents is unenforceable in view of the conduct set forth above. Each of the breaches of the Applicants' duty of good faith and candor, individually and collectively, constitute a basis for rendering unenforceable each of the Parker Patents, and the totality of Applicants' conduct demonstrates inequitable conduct. Each Parker Patent after the first is further unenforceable in view of the infectious unenforceability of the inequitable conduct during the course of the prosecution of the Cameron Applications.

## RESERVATION OF RIGHTS

18.19. Schlegel is still investigating this matter and has not yet had an opportunity to conduct any discovery, and therefore reserves the right to raise such additional defenses as may be appropriate upon further investigation and discovery.

## <u>COUNTERCLAIM</u>

Counterclaimant, Schlegel Electronic Materials, Inc. ("Schlegel"), as and for its counterclaim against counter-defendant, Parker-Hannifin Corporation ("Parker"), hereby alleges as follows:

19.20. Schlegel is a corporation organized and existing under the laws of the State of Delaware, having its principle place of business at 806 Linden Avenue, Suite 100, Rochester, New York 14602.

20.21. As Parker admits in paragraph 1 of its complaint, Parker is a corporation organized and existing under the laws of the State of Ohio having a principal place of business at 6035 Parkland Blvd., Cleveland Ohio.

## JURISDICTION AND VENUE

~~21.~~22.  As Parker admits in paragraph 3 of its complaint, jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Jurisdiction over the declaratory judgment counterclaims is also proper under 28 U.S.C. § 2201.

~~22.~~23.  As Parker admits in paragraph 4 of its complaint, venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

## SCHLEGEL'S PATENTS

~~23.On August 15, 1989, United States Patent Letter No. 4,857,668 (the '668 patent) (attached hereto as Exhibit "A") was duly and legally issued.  The '668 patent is owned by Schlegel.~~

24.    On September 3, 1991, United States Letter Patent No. 5,045,635 (the '635 patent) (attached hereto as Exhibit "~~B~~A") was duly and legally issued.  The '635 patent is owned by Schlegel.

25.    On April 14, 1992, United States Letter Patent No. 5,105,056 (the '056 patent) (attached hereto as Exhibit "~~C~~B") was duly and legally issued.  The '056 patent is owned by Schlegel.

## SCHLEGEL'S ALLEGATIONS OF INFRINGEMENT

~~26.Parker has been and still is infringing at least claim 16 of the '668 patent.~~

~~27.~~26.  Parker has been and still is infringing one or more claims of the '635 patent.

~~28.~~27.  Parker has been and still is infringing one or more claims of the '056 patent.

~~29.~~28.  Parker's infringing activities have included direct infringement, contributory infringement and/or active inducement of infringement within the meaning

of 35 U.S.C. §§ 271(a) through (c).

~~30.~~29.  Parker has committed the acts of infringement in disregard of Schlegel's rights in Schlegel's ~~'668,~~ '635~~,~~ and '056 patents.  Upon information and belief, Parker's infringement has been willful, deliberate and intentional, and will continue, to Schlegel's irreparable harm, unless enjoined by this Court.

**DECLARATION OF INVALIDTY**

~~31.~~30.  Upon information and belief, the claims of Parker's '523, '348, '536, '095, and '393 patents are invalid for failure to satisfy the requirements of the United States patent laws, 35 U.S.C. §§ 101 et seq., including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

**DECLARATION OF UNENFORCEABILITY**

31.      Upon information and belief, the Parker Patents are unenforceable for the reasons detailed in ¶ 18 of the Affirmative Defense set forth above and incorporated here by reference.


**WHEREFORE**, Schlegel prays as follows:

A.  That Parker take nothing by reason of its Complaint, and that judgment be entered for Schlegel;

B.  That Parker's '523, '348, '536, '095, and '393 patents and each and every claim thereof be adjudged to be and declared invalid and unenforceable, and that Schlegel be adjudged not to infringe such patent;

- 17 -

C.  That the Court declare this an exceptional case and award Schlegel its attorneys' fees and costs pursuant to 35 U.S.C. § 285;

D.  That Parker has infringed Schlegel's '668, '635, and '056 patents;

E.  That Parker be permanently enjoined from further conduct which infringes Schlegel's '668, '635, and '056 patents;

F.  That Schlegel be awarded damages adequate to compensate it for Parker's infringement, and that the damages be trebled because of the willful nature of Parker's infringement, together with interest, pursuant to 35 U.S.C. § 284; and

G.  That the Court grant such other and further relief as is just and proper.


Dated:  December 18September 10, 2007

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

By:    *s/ George Pazuniak*
       George Pazuniak (DE # 478)
       James M. Lennon (DE # 4570)
       Martina Tyreus (DE # 4771)
       222 Delaware Avenue, Suite 1501
       Wilmington, DE 19801
       (302) 252-4320

*Of Counsel:*
Dan O'Brien, Esq.
Woods Oviatt Gilman LLP
700 Crossroads Bldg
2 State Street
Rochester, NY 14614

*Attorneys for Defendant/Counterclaimant*
*SCHLEGEL ELECTRONIC MATERIALS, INC.*


**WCSR 3799752v6**

EXHIBIT A
('635 Patent)

to

EXHIBIT 1
(Amended Answer and Counterclaim of Schlegel)

# United States Patent [19]

## Kaplo et al.

[11] Patent Number: 5,045,635

[45] Date of Patent: Sep. 3, 1991

[54] **CONDUCTIVE GASKET WITH FLAME AND ABRASION RESISTANT CONDUCTIVE COATING**

[75] Inventors: **Joseph J. Kaplo**, Pittsford; **William Hoge**, Palmyra; **Craig Lund**, Lima, all of N.Y.

[73] Assignee: **Schlegel Corporation**, Rochester, N.Y.

[21] Appl. No.: **367,210**

[22] Filed: **Jun. 16, 1989**

[51] Int. Cl.⁵ ............................ H05K 9/00; H01S 4/00
[52] U.S. Cl. ............................ **174/35 GC**; 174/35 R; 219/10.55 D; 29/592.1
[58] Field of Search ......... 174/35 R, 35 MS, 35 GC; 361/424; 219/10.55 D, 10.55 R; 29/592.1

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,462,334 | 2/1949 | Pierson | 174/35 GC |
| 3,583,930 | 6/1971 | Ehrreich et al. | 252/514 |
| 3,609,104 | 9/1971 | Ehrreich | 252/511 |
| 4,399,317 | 8/1983 | Van Dyk | 174/35 GC |
| 4,447,492 | 5/1984 | McKaveney | 428/328 |
| 4,857,668 | 8/1989 | Buonanno | 174/35 GC |

Primary Examiner—Leo P. Picard
Assistant Examiner—Bot L. Ledynh
Attorney, Agent, or Firm—Eckert, Seamans, Cherin & Mellott

[57]                    **ABSTRACT**

A conductive gasket for sealing facing flange plates against passage of electromagnetic and environmental effets has a conductive sheath, for example supported on a molded, resilient foam core, and structure for affixing the seal to conductive elements to be sealed. A conductive coating having suspended conductive particles in a nonreactive binder is applied externally to the sheath in order to reduce galvanic corrosion by isolating the dissimilar metals contained in the sealed elements and in the conductive sheath. The sheath coating is preferably applied as a colloidal suspension of carbon particles, to the entire outer surface of a metal plated sheath and provides a low resistance, environmentally isolated junction between the sheath and the elements to be sealed, excluding environmental electrolytes, while improving abrasion resistance and flame retardant attributes of the seal.

**12 Claims, 2 Drawing Sheets**



**U.S. Patent**          Sep. 3, 1991          Sheet 1 of 2          **5,045,635**



FIG. 1

FIG. 2



FIG. 3



FIG. 4

FIG. 5

U.S. Patent       Sep. 3, 1991       Sheet 2 of 2       5,045,635



see fig. 7a, 7b

34

22

40

26

EMBEDDED
MESH
see fig.6b

**FIG. 6a**

**FIG. 7a**

ELASTOMERIC
SHEATH          34        CONDUCTIVE
                          COATING

26

22

FOAMED
CORE                      E.G.
                         SILVER
                         PLATING
BOUNDARY
LAYER

**FIG. 7b**

**FIG. 6b**

CARBON
PARTICLES

URETHANE
BINDER

ELASTOMERIC
SHEATH

METAL
PLATING

5,045,635

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# CONDUCTIVE GASKET WITH FLAME AND ABRASION RESISTANT CONDUCTIVE COATING

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to multi-purpose conductive gaskets for excluding electromagnetic interference (EMI), radio frequency interference (RFI) and also blocking environmental effects such as noise and moisture from the ambient atmosphere. More particularly, the invention concerns a conductive gasket or seal wherein a conductive sheath surrounding a resilient core is coated with a coating formed of a suspension of conductive particles. 2. Prior Art

Conductive seals and gaskets are known in a number of variations. Typically, the gasket bridges across metallic surfaces of adjacent or abutting conductive structures, for example at a closure of a cabinet, at a window or door, etc. The adjacent or abutting structures are to be continuously sealed to one another hermetically, to exclude air and moisture at least at low pressure differential, and also electrically, to exclude electromagnetic and radio frequency interference from affecting elements within the enclosure. Alternatively, the seal or gasket may be intended to prevent environmental or electromagnetic influences from escaping from an enclosure.

U.S. patent application Ser. No. 181,834, filed Apr. 15, 1988 (now U.S. Pat. No. 4,857,668) discloses a multifunction gasket of this general type. The gasket has a continuous, molded, resilient core, which is preferably fire-resistant foamed polyurethane. A flexible, electrically conductive sheath surrounds the foam core and is preferably bonded to a boundary layer around the outside of the core. The sheath can incorporate a metal mesh or foil, but preferably the sheath is resinous, for example Rip-Stop Nylon, and has a thin coating of metal plated thereon, for example silver. Alternative means are provided for mounting the gasket such that the sealed elements, such as electrically conductive doors, access panels and the like, are bridged across electrically and hermetically. Seals of this type are marketed by the Schlegel Corporation, Rochester, New York.

Seals and gaskets of the foregoing description might be appropriate for use in controlled environments where the temperature and humidity are maintained, and also in uncontrolled environments, where temperature and humidity vary. These seals are further employed in highly demanding applications such as marine use, wherein the seals are exposed to salt water, and even to space environments, wherein the seal and sealed elements are exposed to vacuum and high radiation.

Over the range of uses, there are important considerations which affect the choice of component materials for the sealed elements (hereinafter "flange plates") and for the gaskets or seals. Structural metals to be used in housings and cabinet structures, for example, may include various steels, possibly in the form of corrosion resistant alloys, aluminum, copper, magnesium, zinc and the like. It is also possible to alloy or coat metals such as steel to improve resistance to oxidation and corrosion. However, the use of dissimilar metals in conductive contact with one another inherently deteriorates at least one of the dissimilar metals when exposed to an electrolyte, due to galvanic action. When exposed to an electrolyte, (a salt solution having free ions) a migration of electrons occurs, which affects the dissimilar metals unequally due to their different electron valence conditions. The migration of electrons causes accelerated oxidation in the less noble one of the dissimilar metals. The conditions needed for galvanic corrosion are simply the dissimilar metals and the electrolyte in contact with them.

When a conductive gasket for excluding electromagnetic interference is placed between two metal flange plates, dissimilar metals are quite likely to be employed and must be placed in contact. The use of dissimilar metals is expected because desirable attributes in flange plates (e.g., strength and rigidity) are not the same as those in gaskets (e.g., flexibility and maximum electrical conductivity). It is also frequently the case that the area of the seal is exposed to an electrolyte. For cabinet closures, doors and other openable seals, condensation occurs at the junction between environments of different temperatures and humidities, separated by the seal. Corrosion can be expected.

Galvanic corrosion causes a physical deterioration of the seal resulting in deterioration of both electrical and environmental sealing performance. The sealed flange plates develop gaps relative to the gasket as a result of corrosion-induced unevenness of the flange plate surface. The extent of electrical connection across the seal deteriorates due to the fact that metal oxides as a rule are relatively less conductive than the corresponding elemental metal and produce increased electrical resistance between the flange plates or the like to be sealed. The increased electrical resistance reduces the seal effectiveness as does the physical displacement of the conductive parts.

The basic objective of shielding against electromagnetic interference requires blocking passage of electromagnetic waves at the seal or gasket. Both electric and magnetic fields are involved and interact. If an enclosure is surrounded by a theoretically perfect conductor, an incident electric field will be fully reflected because an electric field equal and opposite to the incident electric field is induced in the conductive enclosure. Magnetic fields induce a current in the conductive enclosure, and incident EMI or RFI waves include both electric and magnetic energy. The current induced in the enclosure by the field will vary across the thickness of the conductive enclosure, being greatest at the surface adjacent the incident field. A portion of the electromagnetic wave is reflected at the inner boundary of the enclosure, however, some of the radiation will reach the inside of the enclosure unless the conductive walls are very conductive and very thick.

A gap in the conductive shield produced either by physical spacing or by increased electrical resistance will cause a greater proportion of an incident electromagnetic field to radiate through the shield. Gasket material normally is flexible and has a lower conductivity than the material of the conductive enclosure or shield (i.e., a relatively higher electrical resistance). A highly conductive material is desirable to maintain a low resistance and minimal leakage at the interface between the gasket and the shield-defining flange plates or other elements.

If an air gap exists, the flow of induced current is diverted to those points or areas of the seal and sealed elements which are in contact. A high resistance joint, which may be caused by corrosion of the seal and sealed

5,045,635

| 3 | 4 |

elements at their face and surfaces behaves in a manner similar to a gap.

In view of the corrosion caused by galvanic action between dissimilar metals, it may be desirable to employ similar metals for the sealed elements and the gasket. It is also appropriate to finish the metal which is expected to corrode, to decrease the incidence of corrosion. A relatively more corrosion-prone metal, for example, magnesium, tin, steel or aluminum, can be coated with relatively more-noble finishes which are less likely to corrode, for example, gold, platinum, silver, nickel, etc. Corrosion resistances thus improve for the overall sealed element. On the other hand, corrosion will be even greater if the seal breaks down or is applied so thinly as to be porous, because dissimilar metals are in contact at the site of an electrolyte. Some finishes, for example, chromate conversion coatings (e.g. Iridite for aluminum) are moderately conductive, and improve corrosion performance. Organic finishes can also be used. Such finishes are not fully effective because they are characterized by increased electrical resistance relative to bare metal, and a corresponding decrease in EMI shielding effectiveness; there is a possibility of corrosion should the finish become deteriorated; and in other respects leave room for improvement.

Conductive sheaths for seals available in the Schlegel product line employ various different metals, as needed for sealing between conductive elements of various descriptions. Most EMI/RFI gaskets are placed between two structural metal flanges, usually of aluminum or steel. A conductive gasket is interspersed, for example, the above-described Schlegel gasket with a conductive sheath of metallized nylon, on a foam core. It is also possible to use a sheath formed of a wire mesh or including metal fibers, for example including Monel or Ferrex. Monel is an alloy of nickel, copper and usually iron and manganese. Ferrex is a copper clad steel. While these materials are preferred for good conductivity, galvanic corrosion can be a serious problem.

Given the use of dissimilar metals, steps must be taken to control corrosion. Even when it is practical to seal flanges with finishes such that a more noble member is at the exposed surface and normally prevents electrolytes in the ambient atmosphere from reaching the less-noble metal, it is still desirable to design the interface properly to exclude moisture, and to cause the seal material to fill all gaps caused by uneven flange shapes, surface irregularities, bowing of the flange plates adjacent fasteners, and the like. Typically, designers of conductive elastomer gaskets will select a sheath material such as silver plated or aluminum filled elastomers, or silver-copper elastomers. The seals are kept clear of sump areas and/or are provided with drainage holes to remove any electrolyte accumulating due to condensation, etc. Dessicants may be employed, and protective paints are preferably applied to flange surfaces approaching the area of the seal. Military standards go so far as to prefer double seals, an external environmental seal being employed in addition to an electromagnetic seal. The outer, non-conductive environmental seal protects the inner, conductive seal from the ingress of electrolyte. (See e.g. Mil-Std-1250; Mil-Std-889; or Mil-Std-454).

According to the present invention, the incidence of corrosion can be minimized further, in a manner that also improves the durability of the gasket. The invention can be employed instead of, or in addition to a double seal structure. Contrary to the usual objective of

placing only similar materials in direct abutment across the gasket interface, the invention relies on a further conductive coating on the gasket sheath. The further conductive coating is made from a dispersion of conductive particles in a preferably-curable elastomeric binder. The binder prevents direct exposure of the metal components of the seal to environmental electrolytes, reduces abrasion which could wear away protective or similar-metal coatings on the corrosion-prone flange plates, for example of aluminum, and provides the necessary conductive connection. The corrosion resistant and conductive coating, however, has the further and unexpected benefit of substantially decreasing the flammability of the seal. Preferably, the sheath coating is a colloidal dispersion of conductive particles, especially a colloidal dispersion of carbon particles in a urethane-based flexible elastomeric binder.

Whereas the prior art has recommended doubling seals to isolate an EMI seal from environmental influences, the invention allows the seal to inherently exclude environmental influences (especially electrolytes), while retaining good conductive characteristics.

## SUMMARY OF THE INVENTION

It is an object of the invention to lower the electrical resistance across a gasket interspersed between sealed flange plates.

It is also an object of the invention to exclude environmental electrolytes from dissimilar metals employed at the junction between conductively sealed flange plates.

It is a further object of the invention to improve the durability of conductive seals by decreasing the abrasion effects and flammability.

It is yet another object of the invention to reduce the expense and complexity of seals used to achieve a given degree of effectiveness in electromagnetic shielding.

These and other objects are accomplished by a conductive gasket for sealing facing flange plates against passage of electromagnetic and environmental effects having a conductive sheath, for example supported on a molded, resilient foam core, and structure for affixing the seal to conductive elements to be sealed. A conductive coating having suspended conductive particles in a nonreactive binder is applied externally to the sheath in order to reduce galvanic corrosion by isolating the dissimilar metals contained in the sealed elements and in the conductive sheath. The sheath coating is preferably applied as a dispersion of conductive particles in a flexible elastomeric binder, for example a colloidal dispersion of carbon particles in a urethane-based binder, to the entire outer surface of a metal plated sheath. The coating provides a low resistance, environmentally isolated junction between the sheath and the elements to be sealed, excluding environmental electrolytes, while improving abrasion resistance and flame retardant attributes of the seal.

## BRIEF DESCRIPTION OF THE DRAWINGS

There is shown in the drawings the embodiments that are presently preferred. It should be understood, however, that the invention is not limited to the precise arrangements and instrumentalities shown in the drawings, wherein:

FIG. 1 is a cross sectional view of a slot-mounted conductive seal according to the invention.

FIG. 2 is a section view illustrating mounting of the seal between facing flange plates.

5,045,635

5

FIGS. 3–5 are section views illustrating alternative embodiments of the seal.

FIG. 6a is a perspective view of the cross-section of an embodiment of the seal at the conductive coating.

FIG. 6b is an elevation view showing the embedded mesh according to FIG. 6 a.

FIG. 7a a detailed cross-section from area 7 on FIG. 6, showing the surface structures.

FIG. 7b is a closer detail showing the conductive coating of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The gasket of the invention serves a plurality of functions, having protective features including electromagnetic shielding, isolation from environmental infiltration and prevention of noise emission. This requires providing as continuous as possible an electrically conductive path across the gap defined between sealed flange plates. The body of the gasket is resilient, for example filled with a fire-retardant urethane foam. When compressed the gasket smoothly conforms to the surface of the sealed flange plates adjacent the gap.

Insofar as the seal of the invention can have a foam core, the core preferably defines an outer boundary layer enclosed by the electrically conductive sheath. The foam core and sheath of the seal are preferably joined by a continuous molding process wherein a foam core expands and cures in a traveling mold surrounded by a polyethylene or vinyl laminate sheath with a conductive surface and embedded metal fibers or the like to form a conductive path from the flange plates to the sheath surface. The sheath can have Monel or Ferrex metal fibers therein, or aluminum or silver can be used. The sheath can have an exposed wire mesh outside, but preferably is metallized by a sputtered-on or plated-on conductive coating, for example silver, applied to the outer side of the sheath by a diffusion technique prior to bonding the sheath to the foam core. The underlying structures of the core and sheath can be substantially as disclosed in U.S. patent application Ser. No. 181,834, filed Apr. 15, 1988 (now U.S. Pat. No. 4,857,668), the teachings which are hereby incorporated. This gasket requires only about a 25% compression to be highly effective, and is easily mounted using pressure sensitive adhesives, clip-on or fastener arrangements, or by use of a complementary shape of the seal such that the seal can be compressed into one or more slots in the flange plates. Preferably the foam core is formulated from a combustion-modified high resilience polyurethane.

An embodiment invention is illustrated in FIG. 1. In order to electrically and environmentally bridge across the two facing flanges 50, seal strip 40 is maintained between them. In the embodiment of FIG. 1, the seal 40 is affixed to the respective flange plate by being compressed into a slot 52 of one of the facing flanges 50. It is also possible to employ other attachment techniques for affixing the seal strip 40 in position and some other possibilities are illustrated in FIGS. 3–5, namely magnets, double slot arrangements, spring clips, etc.

FIGS. 6–8 illustrate the respective layers of sheathing and coating applied to the foam core. Seal strip 40 has a central foam body 22, preferably a continuous molded polyurethane foam. This material can be compressed and relaxed many times without deterioration and thus effectively exerts a continuous outward pressure that causes the seal strip 40 to conform to the contour of the facing sealed flange 50, pressing the sheath into electri-

6

cal contact with the facing flange plate and providing a hermetic seal, at least at relatively low differential pressures.

Foam body 22 is enclosed in a conductive sheath 26. Sheath 26 fully enclosing the foam core, the sheath presents a conductive bridge that produces an electrical connection across the flange plates, as needed to block electromagnetic radiation. There is some electrical resistance inherent in the embedded conductive material of the sheath, and additional resistance at the area of surface contact between the flange plates 50 and the conductive sheath 26. The resistance is preferably minimal, due to good surface contact between the respective conductive parts.

The sheath as noted above is preferably a metallized elastomer. The sheath can also be, for example, a metallized elastomer (e.g., metal filled, plated, laminated, etc.). Monel mesh, copper or light metallic sheet element, applied to the foam core when the core was first extruded and expanding. Plated and alloyed combinations are also possible for the mesh and/or other surface metal, for example, silver plated copper-filled elastomer, tin-plated beryllium-copper, tin plated copper clad steel mesh or silver plated aluminum filled elastomer.

The choice of a metal mesh sheath as opposed to a metal-containing elastomeric sheath must be made with consideration given for the extent of shielding needed and the possibility of corrosion of the flanges 50. The resistivity of a continuous body of metal is different than that of a metal-filled elastomer, by several orders of magnitude. Therefore, the choice of an elastomer will imply better resistance to corrosion (due to reduced current carrying for driving the galvanic action) but also deteriorated electro-magnetic shielding. The choice of a metal mesh, for example, has a much higher current carrying capacity but suffers from increased corrosive effects.

According to the invention, a metallized surface or foil as shown in the embodiment of FIGS. 7 and 8 is preferred for good current carrying and shielding capabilities. However, also according to the invention, a mesh or foil as shown in FIGS. 6a and 6b is coated with a surface coating that ameliorates the drawbacks of an exposed metal surface. The surface is protected from access by electrolytes while maintaining conductivity by means of an applied coating containing a dispersion of conductive particles in a binder. A colloidal dispersion of conductive particles provides a conductive path from the sheath surface to the surfaces of the facing flange plates, defined by numerous points of conductive contact between the conductive particles in the coating. The particles on the surfaces of the coating contact the sheath and the flange plate, respectively. Particles residing below the surfaces are embedded in the elastomer and thus protected from exposure to electrolytes. In this manner dissimilar metals can be used in the path between the flange plates, including sheath 26 and its coating 34. Environmental influences such as ambient salt spray or other electrolytes are thus isolated from the area at which corrosion is a greater problem, i.e., between the mesh and its coating.

The coating 34 according to the invention has the additional effect of resisting abrasion between the metal plated or mesh sheath 26 and the facing flange 50. In this manner, the possible deterioration of corrosion resistant surface coatings on flange 50 are better protected. A chromate conversion coating (e.g., Iridite) can be used effectively on aluminum flange plates, and

5,045,635

| 7 | 8 |

the coating of the invention very substantially reduces wear on the coating. As a result, the facing surfaces remain smooth and flat and seal strip 40 easily conforms to the surface.

Surprisingly, the colloidal dispersion according the invention also improves the seal by rendering it less flammable. The foam urethane core is preferably a combustion-modified foam that is not readily flammable. Elastomeric binders, as proposed for the sheath 26 and coating 34, however, are normally flammable. Nevertheless, test results show that the dispersion of conductive particles in an elastomeric binder as applied to the overall sheath has the effect of decreasing the flammability of the overall seal.

Coating 34 is a conductive particulate dispersion in an elastomeric binder, providing a corrosion inhibitor on metallic interfacing surfaces or gasketing used for EMI shielding for electronics and other materials that would otherwise be highly susceptible to galvanic corrosion in the presence of an aggravating electrolyte. The particles employed in the dispersion can be the same metals as in the flange plates, their platings, or the sheath 26. The particles can thus include, for example, flakes or fibers of nickel, aluminum, silver, etc. Preferably, the particles are carbon in the form of carbon black. The particles can also be other forms of carbon, for example graphite, ground as finely as practicable, and carried in an elastomeric binder. In a preferred embodiment, the carbon black is loaded in the elastomeric binder at a loading of about 25% to 40% by weight. Individual particles in the carbon black can be, for example, on the order of 25 to 75 microns ($10^{-6}$ meter) on a side.

The carbon or other conductive particles contained in the coating should be so small as to provide a colloidal (non-settling) dispersion in the particular binder used. A preferred binder is urethane-based elastomer, which is a solvent and resin mixture, applied in thickness comparable to paint to produce a flexible moisture-proof layer. Other possible binders for the conductive particles include acrylics, rubber formulations such as styrene butadiene rubber (SBR) or polyvinyl chloride (PVC), etc. In each case the binder is preferably provided at a viscosity comparable to paints, whereby application to the sheath material is conveniently accomplished using brushes, rollers or sprays.

Conductive colloidal particulate dispersion coatings such as carbon black in urethane binder, maintain a high electrical conductivity and thus achieve an appropriately high performance level of electromagnetic shielding, even when exposed to elevated temperatures or high humidity. Gaskets coated with the material maintain good electrical contact between the underlying highly conductive metal of the plated, mesh or foil sheath 26, with respect to the facing flange. Temperature ranges from −10 to +70 degrees C. are accommodated, notwithstanding the fact that temperature variations within this range are likely to produce condensation and collection of atmospheric electrolyte. In addition to seals formed between facing flange surfaces such as are defined by metallic cabinet components, it is also possible to use the coating of the invention on other surfaces having similar requirements. Conductive tape, cable shielding and even wall coverings can be coated to produce a surface which is resistant to corrosion, deterioration through oxidation from atmospheric exposure, and operable to shield against electromagnetic radiation or interference.

Whereas aluminum is a natural oxidizer which will produce a non-conductive oxide, thereby deteriorating the EMI/RFI shield, the colloidal coating according to the invention intends to inhibit oxidation on the aluminum surface, which improves electrical contact and shielding performance. Therefore, it is possible according to the invention to use untreated aluminum for the mating surfaces of panels and electrical components, that function as shielding elements.

The electrical conductivity of the gasket coating 34 will vary with the concentration of conductive particles in the binder. A relatively higher concentration improves conductivity and a relatively lower concentration improves corrosion resistance. It is presently preferred that the coating be prepared with sufficient concentration of conductive particles to produce about 0.5 to 1.0 ohm per cm, preferably 0.5 ohm per cm surface resistance. A coating of this description, using off-the-shelf carbon black in a urethane binder was applied to a gasket of silver plated rip-stop Nylon with a foamed urethane core, and its performance was compared to that of an uncoated gasket for abrasion effects and for flammability. The coated gasket provided good electromagnetic shielding, good abrasion resistance, and decreased flammability compared to the uncoated gasket.

A 6 mm by 6 mm gasket with a combustion-modified foam core and 30 denier uncoated sheath was subjected to the UL-94 flammability test, with the following results:

| UNCOATED SAMPLE | | | | | |
|---|---|---|---|---|---|
| Sample # | 1 | 2 | 3 | 4 | 5 |
| Duration of flame 1st ignition (sec.) | 4.4 | 3.3 | 2.2 | 7.1 | 2.9 |
| Duration of flame 2nd ignition | | 5.8 | 12.4 | 17.6 | 6.5 |
| Did specimen burn up to clamp? | no | no | no | no | no |
| Did flaming drips ignite the cotton? | yes | yes | no | yes | yes |

The same size gasket with a sheath coated with the colloidal carbon particle suspension of the preferred embodiment performed according to the following tables, the first table showing results with the sample in freshly made condition and the second table showing results for a sample that was "aged" at 70 degrees C., overnight:

| COATED SAMPLE | | | | | |
|---|---|---|---|---|---|
| Sample # | 1 | 2 | 3 | 4 | 5 |
| Duration of flame 1st ignition (sec.) | 0 | 0 | 0 | 0 | 0 |
| Duration of flame 2nd ignition | 3.7 | 0 | 4.4 | 0 | 3.7 |
| Did specimen burn up to clamp? | no | no | no | no | no |
| Did flaming drips ignite the cotton? | no | no | yes | no | no |
| AGED COATED SAMPLE | | | | | |
| Duration of flame 1st ignition (sec.) | 0 | 0 | 0 | 0 | 0 |
| Duration of flame 2nd ignition | 0 | 0 | 0 | 1.7 | 0 |
| Did specimen burn up to clamp? | no | no | no | no | no |
| Did flaming drips ignite the cotton? | no | no | yes | no | no |

5,045,635

| 9 | 10 |

Similarly favorable results were obtained in abrasion resistance. For this test, coated and uncoated gaskets were mounted on a wear tester (CSI - Stoll Quartermaster Universal Wear Tester, Model CS-22C) and cycled over a one inch stroke at 25 cycles per minute, using a bladder pressure of 3 psi and a 2 lb weight. Chromated steel plates were used as the abradent. The extent of abrasion was measured by measuring the average surface resistance and also by visually assessing the proportion of removed chromate coating, using a microscope.

| NUMBER OF CYCLES | % REMOVAL | SURFACE RESISTANCE |
|---|---|---|
| COATED SAMPLE | | |
| 0 | 0% | 0.8 OHM/SQUARE |
| 1,000 | 5 | 0.7 |
| 5,000 | 10 | 0.5 |
| 10,000 | 15 | 0.4 |
| 50,000 | 30 | 0.8 |
| 100,000 | 55 | 1.0 |
| UNCOATED SAMPLE | | |
| 0 | 0% | 0.5 OHM/SQUARE |
| 1,000 | 10 | 0.6 |
| 5,000 | 30 | 1.0 |
| 10,000 | 55 | 1.2 |
| 50,000 | 65 | 1.5 |
| 100,000 | 80 | 2.5 |

Abrasion greater than 60% can be equated with failure of the seal. According to the invention, a substantially improved service life was obtained, while retaining surface resistance within acceptable levels and with unexpected improvement in flammability characteristics. Insofar as flammability was improved, it is believed that the improvement results from covering the metallic plating on the sheath, which otherwise acted somewhat like a wick, to carry volatile materials to the surface and encourage burning.

The invention as disclosed is a sealing apparatus including first and second electrically conductive bodies 50 having conductive surfaces arranged to bear toward one another, a conductive seal 40 being disposed on at least one of the bodies and arranged to be interspersed between the bodies for shielding against passage of at least one of electromagnetic effects and environmental effects. A conductive coating 34 on the seal 40 includes a dispersion of conductive particles in a binder. Preferably, the particles are metal or carbon particles small enough to be carried in a colloidal suspension in the binder. The particles may be carbon particles about 25 to 75 microns in size, loaded in an elastomeric binder in a proportion of about 25% to 40% by weight. The sheath can for example, include at least one of aluminum, tin, copper, silver, gold, Monel and Ferrex. The sheath can be, for example, wire mesh or a foil, the sheath preferably being an elastomeric material with a plated-on or sputtered-on metallized layer or foil, for example of silver. The sheath can include a curable elastomer, silicone, neoprene or the like. A preferred sheath material is silver coated rip stop nylon.

The seal is normally applied to seal the bodies 50, normally including at least one of aluminum, nickel, steel, zinc and magnesium. The bodies 50 can include a metal covered by a surface treatment or plating, for example nickel on steel or aluminum, or a chromate conversion coating or a conductive organic coating. The colloidal dispersion preferably includes metallic particles and a flexible paint, for example a urethane-based paint. The metallic particles can be the same ma-

terial as the sealed bodies 50, for example aluminum. The preferred conductive particles are carbon black, graphite and/or elemental metal nickel.

The invention also concerns a method of sealing electrically conductive bodies against electromagnetic and environmental effects while reducing corrosion. The method includes the steps of interspersing a conductive seal between the bodies 50, coating the conductive seal 40 with a conductive coating 34 having a dispersion of conductive particles, the coating being applied before or after interspersing the seal, at least on an area of the seal disposed against one of the bodies 50. The sheath 26 can include, for example, at least one of aluminum, tin, copper, silver, gold, Monel and Ferrex, and preferably is a wire mesh or metal foil. The sheath can include a curable elastomer, silicone, neoprene or the like, and can be formed from silver coated rip-stop nylon.

The bodies 50 to be sealed normally include at least one of aluminum, nickel, steel, zinc and magnesium. The bodies 50 can include a covering, for example a nickel plating, a chromate conversion coating or a conductive organic coating.

The apparatus of the invention is a gasket for blocking passage of electromagnetic and environmental effects between conductive bodies 50, comprising a continuous, molded, resilient foam core 22 in a flexible, electrically conductive and substantially abrasion resistant sheath 26, externally surrounding the foam core 22 and bonded to the foam core 22, the core filling the interior of the sheath. Means for attaching the gasket to at least one of the bodies are included, such that the resilient foam core presses the sheath against the bodies. A conductive coating is provided on the sheath, the coating being a colloidal dispersion of conductive particles.

The invention can also be characterized as an improved apparatus of the type having at least two conductive bodies and a resilient conductive gasket for blocking electromagnetic and environmental effects from passing the seal between the bodies, the gasket and the bodies together defining dissimilar metals subject to galvanic corrosion when exposed to an electrolyte, the improvement comprising a protective coating 34, applied to the gasket at least on a surface facing one of the bodies, the protective coating including a dispersion of conductive particles. Preferably, the coating is applied to the entire outside of the sheath 26, which can be a metal mesh, foil or the like. The preferred coating is carbon black in a urethane-based flexible binder.

The invention having been disclosed, additional embodiments will be apparent to persons skilled in the art. Reference should be made to the appended claims rather than the foregoing specification as indicating the true scope of the invention.

We claim:

1. An apparatus comprising:
first and second electrically conductive bodies having conductive surfaces arranged to bear towards one another;
a conductive seal body disposed on at least one of the electrically conductive bodies and arranged to be interspersed between the electrically conductive bodies for defining an electrically conductive path and shielding against passage of electromagnetic effects and environmental effects, the conductive seal body defining a highly conductive metal path of at least one of aluminum, nickel, tin, copper,

5,045,635

11

silver, gold, copper clad steel, and an alloy including at least two of nickel, copper, iron and manganese, the highly conductive metal path disposed between the conductive surfaces of the first and second electrically conductive bodies; and,

A sheath on the external surface of the conductive seal body formed by a protective conductive coating including a dispersion of conductive particles in a flexible elastomeric binder, the elastomeric binder including at least one of a curable elastomer, silicone, neoprene and nylon and the conductive particles being chosen from the group carbon black, graphite and elemental metal of size and density to provide a surface resistance in the coating of about 0.5 to 1.0 ohms per cm;

whereby the conductive particles complete a conductive path including the conductive seal body, the conductive path bridging between the electrically conductive bodies, and the elastomeric binder minimizes corrosion at the surfaces of the electrically conductive bodies.

2. The apparatus of claim 1, wherein the dispersion is a colloidal dispersion of the conductive particles and the elastomeric binder is an elastomeric paint.

3. The apparatus of claim 2, wherein the colloidal dispersion includes particles of carbon.

4. An apparatus comprising:

first and second electrically conductive bodies having surfaces arranged to bear towards one another;

a conductive seal disposed on at least one of the bodies and arranged to be interspersed between the bodies and for shielding against passage of at least one of electromagnetic effects and environmental effects;

a sheath on the conductive seal, forming a conductive coating including a dispersion of conductive particles in a flexible elastomeric binder, and wherein the bodies include aluminum covered by at least one of a nickel coating, a chromate conversion coating and a conductive organic coating.

5. The apparatus of claim 4, wherein the conductive coating includes a paint chosen from a group consisting of urethane, acrylic, rubber and polyvinyl chloride based paint.

6. A method of sealing electrically conductive bodies against electromagnetic and environmental effects, while reducing corrosion, comprising the steps of:

interspersing a conductive seal between said bodies;

coating the conductive seal with a conductive coating having a dispersion of conductive particles, said coating being applied at least on an area of the seal disposed against one of said bodies, and, wherein the dispersion of conductive particles is made by mixing together carbon black and an elastomeric binder to provide a coating with a surface resistance of about 0.5 to 1.0 ohms per cm.

7. The apparatus of claim 6, wherein the elastomeric binder includes urethane.

8. A gasket for blocking passage of electromagnetic and environmental effects between conductive bodies, comprising:

12

a continuous, molded, resilient foam core in a flexible, electrically conductive and substantially abrasion resistant sheath externally surrounding the foam core and bonded to the foam core, the foam core filling the interior of the sheath;

means for attaching the gasket to at least one of the bodies such that the resilient foam core presses the sheath against at least one of the bodies, the sheath defining a highly conductive metal path of at least one of aluminum, nickel, tin, copper, silver, gold, copper clad steel, and an alloy including at least two of nickel, copper, iron and manganese; and,

a conductive coating on the external surface of the sheath, the coating including a dispersion of conductive particles in an elastomeric binder including at least one of a curable elastomer, silicone, neoprene and nylon and the conductive particles being chosen from the group consisting of carbon black, graphite and elemental metal of size and density to provide a surface resistance in the coating of about 0.5 to 1.0 ohms per cm;

whereby the gasket blocks passage of electromagnetic and environmental effects while resisting abrasion and flame.

9. The gasket of claim 8, wherein the conductive coating is a colloidal dispersion of carbon black in a urethane binder.

10. An improved apparatus of the type having at least two conductive bodies and a resilient conductive gasket for blocking electromagnetic and environmental effects from passing between the bodies, the gasket and the bodies together defining dissimilar metals subject to galvanic corrosion when exposed to an electrolyte, the improvement comprising:

a protective coating applied to the gasket at least on an external surface of the gasket facing one of said bodies, the protective coating including a colloidal dispersion of conductive particles in an elastomeric binder, the protective coating having a surface resistance of about 0.5 to 1.0 ohms per cm;

whereby the protective coating provides electrical connection bridging between the gasket and the bodies while minimizing said galvanic corrosion.

11. The improved apparatus of claim 10, wherein the conductive particles are chosen from the group consisting of carbon black, graphite and elemental metal.

12. An improved apparatus of the type having at least two conductive bodies and a resilient conductive gasket for blocking electromagnetic and environmental effects from passing between the bodies, the gasket and the bodies together defining dissimilar metals subject to galvanic corrosion when exposed to an electrolyte, the improvement comprising:

a protective coating applied to the gasket at least on a surface facing one of said bodies, the protective coating including a colloidal dispersion of conductive particles, and wherein the conductive particles are about 25 to 75 microns in size and are loaded in an elastomeric binder to a proportion of about 25% to 40% by weight.

\* \* \* \* \*

EXHIBIT B
('056 Patent)

to

EXHIBIT 1
(Amended Answer and Counterclaim of Schlegel)

US005105056A

# United States Patent [19]

## Hoge, Jr. et al.

[11]    Patent Number:    **5,105,056**

[45]    Date of Patent:    **Apr. 14, 1992**

[54]    **ELECTROMAGENTIC SHIELDING WITH DISCONTINUOUS ADHESIVE**

[75]    Inventors:    **William C. Hoge, Jr.**, Palmyra; **Merle C. Ferris**, Rochester, both of N.Y.

[73]    Assignee:    **Schlegel Corporation**, Rochester, N.Y.

[21]    Appl. No.:    **604,562**

[22]    Filed:    **Oct. 26, 1990**

[51]    Int. Cl.$^5$ .............................................. H05K 9/00
[52]    U.S. Cl. ............................ 174/35 GC; 174/35 MS
[58]    Field of Search .......... 174/35 GC, 35 R, 35 MS; 219/10.55 D, 10.55 R; 361/424; 277/227, 228, 229, 230, 235 R, 235 A; 156/60, 295

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

4,857,668    8/1989    Buonanno ...................... 174/35 GC
4,988,550    1/1991    Keyser et al. ......................... 428/40

### OTHER PUBLICATIONS

Severinsen, Gasket that Block EMI, vol. 47, No. 19 (Aug. 7, 1975).

*Primary Examiner*—Leo P. Picard
*Assistant Examiner*—Bot Ledynh

*Attorney, Agent, or Firm*—Eckert Seamans Cherin & Mellott

[57]    **ABSTRACT**

A shield blocks passage of electromagnetic energy through a seam of indefinite length between conductive elements and is adhesively attached to at least one of the elements. A preferably non-conductive adhesive is disposed on a conductive surface of a seal in a discontinuous pattern along the length of the seam, defining area of 5–40% adhesive for physically attaching the conductive surface, separated by 60–95% exposed areas for direct electrical contact. The seal can include a compressible body or can be defined by a conductive sheet, for example a fabric provided with a plating or other conductive coating. The areas of adhesive preferably define longitudinally non-overlapping inclined lines extending laterally across the seam. A release liner can removably attach to the adhesive. In a preferred embodiment the conductive surface is the surface of a compressible seal body, such as a conductive sheath on a compressible core. A conductive path extends without interruption along the length of the seam and across the lateral width of the seam at the adhesive lines, providing improved physical attachment and conductivity characteristics for the shielded seam as a whole.

26 Claims, 2 Drawing Sheets



U.S. Patent        Apr. 14, 1992        Sheet 1 of 2        5,105,056



FIG. 1

FIG. 2

FIG. 3

EXPOSED
(60%)

ADHESIVE
(40%)

FIG. 6

FIG. 4

FIG. 5



FIG. 7

FIG. 8



FIG. 9a

FIG. 9b

FIG. 9c

5,105,056

| 1 | 2 |

# ELECTROMAGNETIC SHIELDING WITH DISCONTINUOUS ADHESIVE

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to the field of electromagnetic shielding, including conductive seals and gaskets for sealing between abutted parts of conductive bodies, and also to shielding material in sheet form, applied as a barrier to electromagnetic radiation passing into or out of enclosures, cables, conduits and the like. In particular, the invention concerns such shielding seals, gaskets and/or sheets wherein the material of the shield is affixed to a conductive surface by a discontinuous and preferably nonconductive adhesive.

### 2. Prior Art

Shielding against electromagnetic interference (EMI) involves providing a conductive barrier in which currents induced by incident electromagnetic fields are grounded and/or dissipated in eddy currents. Conductive seals and gaskets typically are used to render continuously conductive the junction of an abutment between conductive parts of the enclosures of electrical or electronic equipment. The conductive parts of an enclosure may be relatively movable, as in the case of a door of a cabinet, or the conductive parts can be intended to remain abutted, as in the case of panels which are held together by fasteners. The shielding of cables and the like typically involves surrounding the entire cable in a shield material Similarly, conductive seals and gaskets may have a conductive sheet material wrapped or wound on a compressible form. While it is possible to form a seamless tube of conductive sheet material for a cable shield, it is also possible to wrap the cable with conductive sheet material, defining a longitudinal or helical seam at which the conductive material must be joined so as to conduct across the seam. Seams are also defined in use between conductive material of a seal or gasket and the cabinet panels or the like to which the seal or gasket is affixed.

The shielding may be intended either to confine or to exclude electromagnetic interference. In connection with microwave ovens and the like, for example, the objective is to confine the microwave field to the inside of the enclosure. In connection with communications equipment and the like, the objective may be either or both of isolating the circuitry within an enclosure from ambient electromagnetic interference (EMI) and/or protecting other equipment from interference generated in the shielded equipment. Shielding can protect against potential damage as well as potential improper operation due to induction of currents by external fields. Apart from interference, electromagnetic shielding techniques may be employed to protect vulnerable circuitry from damage due to electromagnetic pulses, such as are produced by nuclear detonations.

Whether the plane or surface to be shielded is between movable or immovable conductive surfaces, or whether the shield material is to be wrapped around an element without bridging across conductive surfaces other than the shield material itself, the need to conductively fix the shield material at least at one seam is common to all shielding arrangements. In each case the shield resides across the path of incident electromagnetic radiation, defining a substantially continuously conductive body (either alone or in conduction with conductive panels or the like), so as to block propagation of electromagnetic fields.

A conductive gasket or seal is known wherein a conductive sheath of woven or knitted wire encloses a compressible core. This form of seal can be mounted, for example, in a slot in a first conductive panel or body and arranged to bear against a second panel or body brought into abutment with the first. In movable panel arrangements, one of the panels normally carries the seal and the other of the panels simply abuts against the seal. If the sealed panels are to remain immovable, the seal can be attached to one or both.

Typically, such a seal is attached to the conductive panel or the like at least partly by an adhesive at the connecting seam. For maximum shielding efficiency there is a need to avoid undue electrical resistance across the seam, i.e., between the seal and the surface against which it abuts. The resistance normally includes electrical resistance due to the adhesive disposed between the conductive panel and the conductive material of the seal. The typical technique for attaching the seal to the conductive panel is to place a continuous bead of conductive adhesive on the conductive sheath of the seal, at least on one side of the seal to be disposed against a conductive panel. Conductive adhesive is rendered conductive by conductive particles disposed in the adhesive binder, defining a conductive path through the adhesive due to surface contact of the particles within the binder. The binder typically consists essentially of a nonconductive elastomer which otherwise would function as an insulator, or in connection with adhesive disposed between conductive panels, as a dielectric.

Conductive adhesives tend to break down over time The conductive particles can migrate in the elastomeric binder, particularly with compression and decompression of the seal. Often the result of cycles of compression and decompression is that the conductive particles tend to become spaced from the surface of the adhesive as the elastomer flows viscously around the particles. This causes a gradual decrease in the conductivity of the seal as a whole, due to the increase in resistance across the adhesive. Additionally, the conductive particles in the binder of the adhesive can break down over time due to mechanical and environmental effects. The breakdown of the conductive portion of the adhesive is accelerated where the conductive sheath of the seal is made of a wire mesh or the like, wherein movement of the wire portions of the sheath relative to the viscous binder of the adhesive kneads the adhesive material

In U.S. Pat. No. 4,857,668—Buonanno, a seal is disclosed which includes a conductive sheath on a resilient foamed core. A preferred material for the sheath is ripstop nylon, a polymer fabric, and the filaments of the fabric can be plated with a conductive material (e.g., metal). The sheath can be mounted to one of the sealed panels by means of conductive clips or by engagement in a groove or the like. Alternatively, the seal can be attached to its panel via a conductive adhesive. The sheath according to Buonanno can be rendered conductive at least partly by an outer conductive coating of relatively inert particles such as carbon black in a binder of elastomer such as urethane. The conductive particles provide a current path, while the elastomeric binder as well as the inert conductive particles avoid presenting an abrasive surface or a surface subject to corrosion. Any corrosion on the surfaces in contact between a conductive seal and a conductive panel tends to reduce

5,105,056

3

the smoothness of the seal, thereby presenting a possibility of gaps, and also tends to increase surface resistance, leading to reduced shielding effectiveness of the seal. The particular sheath composition is an important consideration and is given substantial attention by those skilled in the art.

Other forms of seals are also known for placement between conductive panels. The seals range from wholly metallic sheet metal structures, for example with spring-like metal forms protruding from a metal strip, or helically wound metal strips, to resilient forms of rubber or plastic enclosed in woven, knitted or unwoven batts of conductive sheathing. In each case the seal provides conductive surfaces to be placed in contact with the conductive panels to be bridged by a conductive material for effecting an EMI shield. All these forms must be attached to the conductive panels, typically by an adhesive.

A seal formed in part of a sheet of conductive sheathing can be wrapped around a resilient core to form a seal or gasket to reside between conductive panels. In the same manner, a conductive sheath can be wrapped around a cable or the like. The sheathing may be formed as a tube, however, wrapping is more convenient. When wrapping an elongated strip around a core, cable or other elongated structure, the lateral edges of the sheathing must be conductively attached together along a longitudinal seam to ensure that the entire sheath is uniformly conductive. Similarly, when applying a conductive sheath (without a core) to a surface to be shielded, the sheath must be affixed to the surface both conductively and in a manner that physically retains the sheath in place. The physical retention of the sheath often requires an adhesive.

Assuming the conductive sheath or seal is to be attached (to itself or to conductive panels) in a routine manner with the object of improving the continuity and decreasing the resistance of the conductive path across the junction of the attachment, a conductive adhesive will provide a continuous conductive path. However, as noted above, conductive adhesives tend to break down and become less conductive over time. The inherent resistance of the adhesive is interspersed between the conductive elements at the junction, thereby increasing electrical resistance along the conductive path between the sealed panels. Conductive adhesive is more expensive than nonconductive adhesive due to the need for the additional conductive particles. The added particles render the adhesive less sticky than a comparable quantity of nonconductive adhesive due to the fact that the conductive particles displace the sticky adhesive material, thus requiring a greater quantity of adhesive for a given strength joint. For all these reasons, it would be helpful to avoid or minimize reliance on conductive adhesive for the electrical and/or mechanical joining of the parts of conductive sheaths and panels.

According to the present invention, the conventional use of conductive adhesive applied as a continuous bead or surface has been reconsidered. Rather than mounting a conductive sheathed seal body on a continuous strip of conductive adhesive, and rather than attaching a conductive sheet either at its edges or to a full surface, adhesive is applied discontinuously, for example in the form of regularly spaced adhesive dots, or preferably along spaced lines, at the conductive and physical junction of the sheath or seal. Contrary to expectations, the lack of an adhesive material in the area between the adhesive lines or dots does not reduce the effectiveness

4

of the seal, particularly if the adhesive is arranged in the form of longitudinally non-overlapping lines inclined laterally across the connecting seam of the seal. In fact the seal is more effective because greater direct contact between the panels and the conductive sheath of the seal provides an overall conductive EMI shielding barrier that intersperses only the contact resistance of the sheath and the panel between the abutting elements along the path of electromagnetic propagation. While conductive adhesive can be used, a less expensive nonconductive adhesive is preferred, because the direct contact between the surface of the conductive sheath and the panel provides at least as good continuity along the length of the junction to compare favorably with conductive junctions having a conductive adhesive disposed continuously between the sheath and the panel, or at overlapped sections of the sheath. Moreover, the adhesion of the seal material at the seam is improved over conductive adhesives of equal amount, and the conductivity of the seal does not deteriorate over its lifetime.

## SUMMARY OF THE INVENTION

It is an object of the invention to reduce the cost and complexity of a mounting for a conductive seal, while retaining full effectiveness of the seal for electromagnetic shielding between conductive panels by minimizing electrical resistance along a path between such panels having an interspersed adhesively attached gasket or seal.

It is another object of the invention to improve the conductivity in the long term of shielding junctions, for example between conductive seals and conductive panels to which the seals are attached, or between conductive sheet materials or sheaths and other conductive elements to which the sheet or sheath material is physically and electrically connected.

It is also an object of the invention to improve the conductive characteristics of a sheet, seal or gasket by maximizing surface contact between the conductive elements which are abutted in use to define a barrier to electromagnetic propagation.

It is another object of the invention to enable the use of inexpensive nonconductive adhesive in a conductive EMI shielding seal.

It is still another object of the invention to provide a connection means for a seal or sheath that is easy to use, physically strong and of moderate cost.

These and other objects are accomplished by a method and apparatus which shield against passage of electromagnetic energy through an abutment between conductive elements The shield may be formed by a sheet, seal or gasket including a conductive shield body of indefinite length to be mounted adhesively to at least one other conductive body, which other conductive body, in an overlapped sheet shield can be another portion of the shield material. The shield body may be a seal with a conductively sheathed compressible structure to be attached to and abutted against conductive panels, or can include a sheet material to be conductively fixed by one or both edges to a conductive panel or to itself.

An adhesive is disposed on a surface of the conductive body, the adhesive being discontinuous along the length of the shield body, thereby defining areas of adhesive separated by areas wherein the conductive shield body is exposed for direct surface contact. The areas of adhesive and the areas wherein the conductive

5,105,056

| 5 | 6 |

shield body is exposed can define a regular repetitive pattern along the length of the junction, such as a pattern of spaced dots or lines. A series of spaced adhesive lines, inclined relative to the length of the seam or junction, can extend across a lateral width of the junction, preferably in a longitudinally non-overlapping manner. The proportion of adhesive space to exposed space at the junction is preferably about 40% adhesive to 60% exposed, and depending on the extent of mechanical attachment needed, can be as little as 5% adhesive to 95% exposed. The conductive shield body can be supplied with a release liner removably attached to seal via the adhesive, such that the liner is pulled off to expose the adhesive for mounting the shield body. The adhesive is preferably a nonconductive hot melt adhesive, but a conductive adhesive is also possible. When the shield body is affixed, a conductive path is provided, including surface contact at the exposed areas of the shield. According to the embodiment wherein inclined lines of adhesive are disposed along the junction, the adhesive lines can be arranged in a laterally non-overlapping arrangement to provide a single thickness of adhesive line at all points along the junction.

BRIEF DESCRIPTION OF THE DRAWINGS

There are shown in the drawings the embodiments of the invention as presently preferred. It should be understood, however, that the invention is not limited to the exemplary embodiments shown, and is capable of embodiment in other specific forms in accordance with the scope of the invention as claimed. In the drawings,

FIG. 1 is a perspective illustration of a seal or gasket according to the invention, with discontinuous adhesive applied in the form of inclined non-overlapping lines;

FIG. 2 is an elevation view showing the seal of FIG. 1, interspersed between two conductive panels;

FIG. 3 is a diagrammatic plan view showing the proportion of exposed area to adhesive area, according to an embodiment wherein the adhesive is applied as spaced dots;

FIG. 4 is a partial section view through a junction of the seal and a panel, along line 6—6 in FIG. 2, showing the seal as compressed;

FIG. 5 is a perspective view showing the seal with a release liner;

FIG. 6 is a plan view of an alternative embodiment, with a different pattern of discontinuous adhesive;

FIG. 7 is a perspective view showing a shield formed of a sheet of conductive material wrapped on an elongated body to be shielded;

FIG. 8 is a section view directed longitudinally along a seam with a shield formed of a sheet of conductive material attached along edges to conductive panels; and,

FIGS. 9a–9c illustrations of additional forms of shielding seals to which the invention is applicable, FIGS. 9a and 9b being in perspective and FIG. 9c being in elevation.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The invention concerns the conductive connection of parts to block electromagnetic radiation, and is applicable to a number of types of shielding apparatus to be bridged at a seam with a conductive material. The conductive material bridging the seam can be more or less flexible and can be thick or thin, depending on the particular application. In each case, a discontinuous adhe-

sive material is applied to affix the conductive material or shield at one or both of the edges of the seam.

FIG. 1 is a perspective illustration of a compressible seal or gasket according to the invention, including an illustration of the cross section of the seal body at the end shown. The seal body can be of any length, preferably long enough to encompass the full length of the line or seam to be sealed against passage of electromagnetic interference (EMI). The shield, in this case the compressible seal, resides along a junction between conductive panels, and by conductively bridging between the panels provides a continuous conductive barrier against the propagation of electromagnetic interference either into or out of the area encompassed by the panels and the shield.

The seal body defining the shield 30 in FIG. 1 includes a conductive sheath 32 on a compressible core 34. The seal body can be substantially as described in U.S. Pat. No. 4,857,668—Buonanno, namely with a foamed elastomer core and a sheath of metal plated or conductively coated ripstop nylon. An anti-abrasive coating can be applied on the external surface of the sheath 32, formed of conductive particles (e.g., conductive carbon black) suspended in an elastomeric binder in sufficient concentration to obtain with the conductive sheath an overall conductive body. U.S. Pat. No. 4,857,668—Buonanno is hereby incorporated. It is also possible to employ the invention with other forms of shielding seal structures, as discussed hereinafter, for example seals with wire mesh woven or knitted around a resilient core, and wholly metallic shielding seals, for example with helically wound metal strips or formed spring-like metal tongues protruding from a strip attachable to one panel and resiliently bearing against the opposed panel. Other forms of shield seals, as well as shields having a sheet of conductive material, can be attached by an adhesive according to the invention.

FIG. 2 shows a shielding seal of the type shown in FIG. 1, interspersed between conductive bodies or panels 24, for example a movable door panel and a stationary cabinet panel against which the door panel rests when closed. The shielding seal provides a conductive path bridging across any space which may be defined between the two panels 24, due to minor misalignment, surface irregularities and the like. The seal thereby blocks the propagation of electromagnetic interference and the like, in either direction through the opening otherwise defined between the panels.

When in operative position, the shield strip or body 30 is fixed to at least one of the panels via an adhesive disposed on the shield, e.g., on a surface of a conductive sheath. The adhesive is discontinuous along the length of the seal body, thereby defining a plurality of areas 50 of adhesive for physically attaching the shield to at least one of the panels, separated by areas 60 wherein the conductive material of the shield (e.g., the conductive sheath) is exposed directly for conductive surface contact with the panels.

The sheathing 32 of the shield in the embodiment of FIGS. 1 and 2 is wrapped circumferentially around a compressible core 34 of the shield. Accordingly, an elongated longitudinal seam 35 is defined where the sheathing overlaps itself, the edges of the sheathing at the seam being in conductive contact such that the shield as a whole is uniformly conductive across the panels. This seam 35 of the sheathing 32 can also be affixed via a discontinuous adhesive according to the invention. The invention is described primarily with

5,105,056

7

respect to a compressible seal adhesively fixed to one panel and simply abutted against a relatively movable opposed panel. The seal can be attached to both panels in an embodiment wherein the panels are to remain fixed in abutment, the seal thus being used in the manner of a fixed gasket. The adhesive attachment of the seal to a conductive body also applies to the attachment of edges of sheathing to define a longitudinal or helical conductive seam, and to attachment of other forms of conductive sheets and strips to conductive bodies to be shielded.

In the exposed areas 60, the conductive shield material, in the case of FIGS. 1 and 2 the sheath, is urged by the compressible foam core 34 to bear directly against the panel to which the seal body is attached. The surface of the conductive sheath bearing against the panel is made discontinuous along the length of the seal by the areas 50 of adhesive. On the opposite panel, however, the foam core holds the conductive sheath in continuous contact. In a similar manner the pressure of spring-like seals of sheet metal and the like urges a surface of the conductive shield body against the opposite panel.

On the attachment side(s), the areas 50 of adhesive and the areas 60 wherein the conductive shield material is exposed define a regular repetitive pattern along the length of the seal. The pattern can be simple spots or dots of adhesive as shown in FIG. 3, but preferably is arranged as a pattern of longitudinally non-overlapping lines extending laterally across the seam, to maximize both the extent of conductive surface contact and the extent of physical attachment of the material across the seam.

The particular dimensions of the adhesive areas are in part a function of the dimensions of the seal body and in part a function of the required extent of physical attachment. For larger seals and/or seals which are to be more securely affixed, larger adhesive areas are preferable. The proportion of adhesive area to exposed area can vary between a minimum adhesive arrangement having only enough adhesive to barely hold the seal in place, for example at least 5% adhesive area to 95% exposed area. The proportion of adhesive can range from 5% to 40%, to exposed area of 95% to 60%. For better adhesion the relatively larger proportions of adhesive are needed. In order to obtain favorable conductivity characteristics together with good adhesive bonding to ensure that the seal remains attached to panel 24 or the like, the areas 50 of adhesive and the exposed areas 60 preferably are provided in a proportion of substantially 40% adhesive area to 60% exposed area.

FIGS. 1-6 illustrate a seal having a rectangular cross section, for example of about 3 by 5 mm. According to FIG. 3, which shows the wider proportion of adhesive, adhesive spots on the wider side of the rectangular form seal are arranged in a non-overlapping manner, about 2 or 3 mm in diameter and spaced on 1 cm centers. This arrangement places a relatively larger proportion of the surface in contact with the panel and provides good adhesive bonding to hold the seal in place.

In a preferred embodiment as shown in FIG. 4, the adhesive defines a regular repetitive pattern of lines along the length of the seal. The lines are inclined laterally of the longitudinal axis of the seam, and can extend laterally across the full width of the seam. In FIG. 4 the seal is shown compressed (i.e., between panels 24). As a result of compression, the seal becomes widened slightly such that the adhesive lines do not extend clear

8

to the edges 39, although the adhesive initially extended to the at-rest edges 38 of the seal, shown in broken lines.

The areas of adhesive define lines which are non-overlapping as viewed laterally of the seam. The end of each of the lines is longitudinally coextensive and laterally spaced from an end of a next one of the lines. As a result, the seam is provided with an equal lateral width of adhesive at substantially every longitudinal point along the longitudinal extension of the seam. The adhesive as thus applied provides a secure attachment to the conductive element to which the adhesive attaches the seal. At the same time, the pattern is such that at every longitudinal point along the seam there is a substantial exposed conductive area, considering the lateral extension of the seam (i.e., the adhesive occupies a relatively small part along any lateral line across the seam). This arrangement leads to good mechanical attachment and electrical shielding attributes.

Preferably, the conductive seal surface is supplied with a release liner, for example a coated strip of paper, removably attached to the seal via the adhesive as shown in FIG. 5. The user peels the release liner from the adhesive prior to attaching the seal across the seam. Inasmuch as the adhesive lines are longitudinally coextensive and the release liner is peeled longitudinally from the seal, the release liner peels continuously upward from the adhesive, rather than by discontinuously popping free at the exposed areas.

The same longitudinally continuous and laterally discontinuous nature of the adhesive pattern as shown, provides secure mechanical connection when the seal is installed. Moreover, the seal is equally conductive with the conductive element to which it is attached, at all longitudinal points along the seam because the proportion of exposed area to adhesive area does not vary. Due to these aspects, it is possible to obtain as good or better conductivity (and therefore shielding effectiveness across the seam) with a nonconductive adhesive, as a seal having a continuous conductive adhesive bead extending all along the seal parallel to the longitudinal axis thereof.

Of course a conductive adhesive can be used if desired. Inasmuch as the conductivity of the seal as a whole is obtained substantially through surface contact of the conductive sheath of the seal and the panels 24, a nonconductive adhesive also functions quite well. A preferred nonconductive adhesive material is hot melt adhesive. The adhesive can be applied in a production setup for example by passing the seal by an adhesive dispensing head which operates intermittently at the required rate, or which is arranged to sense the linear passage of the seal and to dispense a quantity of adhesive at the required spacing. Alternatively, the adhesive can be "printed" on the conductive sheath, using an applicator wheel to which lines of adhesive are applied at regular spaces around the circumference, and transferred to the seal.

The pattern of adhesive can be varied while retaining the non-overlapping arrangement described. In FIG. 6, a different shape of adhesive area is provided, wherein parts of the adhesive lines run parallel to the seal. While the shape of the adhesive can be varied, for example to provide particular characteristics in the adhesive bonding of the seal body and the panel, in each case sufficient space 60 between the adhesive areas 50 is provided to ensure good conductive surface contact between a substantial proportion of the seal body and the panels.

5,105,056

<table>
<tr><td>9</td><td>10</td></tr>
</table>

A conductive seam using discontinuous adhesive can be used for other forms of shielding, as shown for example in FIGS. 7 and 8. In these embodiments the shield involves the conductive attachment of a sheet-like conductive material to articles to be shielded In FIG. 7, the shield material 32 is arranged to shield a cable 25. The shield material can be wrapped to form a longitudinal seam, or as shown, the shield material can form a seam that proceeds helically along the cable 25. As above, the shield material is conductive, for example being made of a metal foil, metal plated or conductively coated paper or fabric, or the like. The shield material 32 overlaps each previous wrap of shield material to form a seam 35 at which the conductive material of the shield is physically attached and placed in electrically conductive contact with the previous wrap. This is accomplished using a discontinuous pattern of adhesive, preferably with a broken line of segments which extend laterally of the helical seam and are non-overlapping along the (helical) line of the seam. The helical wrapping of the shield material 32 tends to provide the necessary inward force to urge the wraps into contact in the exposed areas between the discontinuous adhesive areas, and this inward force can be increased by using a conductive shield material which stretches resiliently to some extent, for example a conductively coated fabric material.

In FIG. 8, a sheet form of conductive shield is attached via a discontinuous series of inclined adhesive lines to each of two conductive panels 24. FIG. 8 is a cross-section viewed along the axis of the two seams formed between the conductive shield material 32 and the two panels 24. As is apparent from FIG. 8, very little of the lateral extension of the material 32 bridging across the conductive panels is occupied by the adhesive and most of the lateral extension of the shield material is in direct surface contact with the panels. Accordingly, a secure and quite conductive bridge is formed between the two panels for blocking propagation of electromagnetic interference.

FIGS. 9a–9c illustrate application of the discontinuous adhesive to additional forms of conductive seals. Each of the illustrated embodiments is compressible. In FIG. 9a, a wire knit or mesh 131 forms the conductive material of the seal and is arranged on a cylindrical compressible core. The adhesive lines 50 are provided on a side of the seal to define a section of a helix on the conductive mesh or knit. When the seal is compressed in use, the core flattens the adhesive against a panel (or a groove in a panel, etc.) to obtain a conductive seam.

FIGS. 9b illustrates application of a discontinuous adhesive to an electromagnetic seal of the type having resilient conductive tongues 133 protruding from a conductive base strip 134. The base strip 134 is conductively and physically joined to a panel or the like using the discontinuous pattern of adhesive as described above, and the tongues bear against an opposed panel to obtain a conductive bridge between the panels The seal can be integral sheet metal or can be a conductively coated resilient material such as plated or coated plastic.

In FIG. 9c, the seal has helically wrapped conductive material. The inclined lines of adhesive, as in the embodiment of FIG. 9a, run along a side of the substantially cylindrical shape of the seal. The adhesive lines in the arrangement shown are further made discontinuous by the gaps between successive wraps of the helical conductive material, which can be sheet metal, conductively coated plastic, etc., and is also arranged to be compressed between conductive panels or the like.

The invention can also be considered a method for mounting a seal against passage of electromagnetic energy through an abutment of conductive panels, or a method for blocking electromagnetic energy. The method includes providing a conductive shield material 32 of the type described, in an indefinite length, for example on a compressible core 34. An adhesive 50 is applied to a surface 36 of the conductive material, the adhesive being discontinuous along the length of a seam to be formed using the shield material, the adhesive defining a plurality of areas 50 of adhesive, separated by areas 60 wherein the conductive material 32 is exposed directly. The seam is formed by attaching the shield material via said adhesive 50 to at least one conductive surface such as the surface of conductive panels to be bridged by the shield. The panels can be brought into abutment with the seal interspersed, whereby conductivity between the panels includes a conductive path from the panels directly to the exposed areas of the conductive shield material. Conduction between the panels or the like occurs through the conductive shield material 32. The conductive material can be arranged as a sheet or as a sheath on a compressible form or core. The shield material or sheath can be rendered conductive due to its composition (e.g., including a metallic form, foil or mesh, and/or can have a conductive coating).

Preferably, the adhesive is applied such that the areas 50 of adhesive and the areas 60 wherein the conductive sheath is exposed define a regular repetitive pattern 52 along the length of the seal. The pattern is preferably a series of spaced lines on the surface of the conductive sheath, in a proportion of 5–40% adhesive to 95–60% exposed area, preferably in a proportion of substantially 40% adhesive area to 60% exposed area. The lines should be inclined laterally relative to the seam to be formed, with the ends of each segment longitudinally coextensive with a next segment so as to be non-overlapping along the seam. Prior to mounting the seal on the panels, the seal can be protected by attaching a release liner to the conductive material via said adhesive. The release liner is removed before attaching the conductive material to form the seam.

Although the method is specific to EMI shielding, the adhesive applied to the conductive sheath can be conductive or nonconductive, in either case sufficient conductivity bridging across the gap between the panels is provided by the conductive sheath in surface contact with the panels, together with good adhesion. A preferred adhesive is nonconductive hot melt adhesive.

The invention having been disclosed, a number of variations will now occur to persons skilled in the art of EMI shielding. Reference should be made to the pending claims rather than the foregoing discussion of exemplary embodiments to determine the scope of the invention in which exclusive rights are claimed.

We claim:

1. An apparatus for shielding against passage of electromagnetic energy through a seam with a conductive body, comprising:

a conductive seal of indefinite length, operative to conduct laterally of a longitudinal extension of the seal;

an adhesive disposed on a surface of the conductive seal, the adhesive being discontinuous along said length of the seal, thereby defining a plurality of areas of adhesive, for attaching the seal physically

5,105,056

| 11 | 12 |

across the seam, separated by areas wherein the seal is exposed directly, for coupling the seal electrically across the seam, the areas of adhesive and the exposed areas defining a regular repetitive pattern along the length of the seal, in a proportion of about 5% to 40% adhesive area to 60% to 95% exposed area.

**2**. The apparatus according to claim **1**, wherein the plurality of areas of adhesive define a broken line on the surface of the conductive seal at the seam.

**3**. An apparatus for shielding against passage of electromagnetic energy through a seam with a conductive body, comprising:

a conductive seal of indefinite length, operative to conduct laterally of a longitudinal extension of the seal;

an adhesive disposed on a surface of the conductive seal, the adhesive being discontinuous along said length of the seal, thereby defining a plurality of areas of adhesive, for attaching the seal physically across the seam, separated by areas wherein the seal is exposed directly, for coupling the seal electrically across the seam, and wherein the areas of the adhesive define a succession of lines included laterally of the longitudinal extension of the seam.

**4**. The apparatus according to claim **3**, wherein the areas of adhesive define lines which are non-overlapping as viewed laterally of the seam.

**5**. The apparatus according to claim **4**, wherein an end of each of the lines is longitudinally coextensive and laterally spaced from and end of a next one of the lines.

**6**. An apparatus for shielding against passage of electromagnetic energy through a seam with a conductive body, comprising:

a conductive seal of indefinite length, operative to conduct laterally of a longitudinal extension to the seal;

an adhesive disposed on a surface of the conductive seal, the adhesive being discontinuous along said length of the seal, thereby defining a plurality of areas of adhesive, for attaching the seal physically across the seam, separated by areas wherein the seal is exposed directly, for coupling the seal electrically across the seam, the areas of adhesive and the exposed areas defining a regular repetitive pattern along the length of the seal, and wherein the adhesive is substantially nonconductive.

**7**. The apparatus according to claim **6**, further comprising a release liner removably attached to the adhesive.

**8**. The apparatus according to claim **6**, wherein the seam is defined between a compressible seal body and a conductive panel.

**9**. The apparatus according to claim **6**, wherein the seam is defined between a conductive sheet edge and a conductive body.

**10**. The apparatus according to claim **6**, wherein the seam is defined between overlapping portions of a conductive sheath.

**11**. A method for mounting a seal against passage of electromagnetic energy through a seam between conductive bodies, comprising the steps of:

providing a conductive seal of indefinite length, operable to conduct laterally of a longitudinal extension of the seam;

applying an adhesive to a surface of the conductive seal, the adhesive being discontinuous along said length of the seal and applied in a regular repetitive pattern, thereby defining a plurality of areas of adhesive for attaching the seal physically across the seam, separated by areas wherein the seal is exposed directly, for coupling the seal electrically across the seam, the adhesive being applied in a proportion of about 5% to 40% adhesive area to 60% to 95% exposed area; and,

attaching the seal via said adhesive to a surface of at least one of said conductive bodies.

**12**. The method according to claim **11**, comprising applying the adhesive such that the plurality of areas of adhesive define a broken line on the surface of the at least one conductive body.

**13**. The method according to claim **11**, further comprising attaching a release liner to the seal via said adhesive, and removing the release liner before attaching the seal to said one of the conductive bodies.

**14**. The method according to claim **11**, wherein the adhesive applied is substantially nonconductive.

**15**. The method according to claim **14**, wherein the adhesive is applied to form a regular pattern of successive lines inclined relative to a longitudinal extension of the seam.

**16**. The method according to claim **15**, wherein the successive lines are applied such that an end of each of the lines is longitudinally coextensive with and laterally displaced from an end of a next successive line along the seam.

**17**. An apparatus for shielding against passage of electromagnetic energy through an abutment of conductive panels, comprising:

a seal body of indefinite length, having a conductive surface disposed on a compressible element;

an adhesive disposed on the conductive surface, the adhesive being discontinuous along said length of the seal body, thereby defining a plurality of areas of adhesive, for attaching the seal body to at least one said panel, separated by areas wherein the conductive surface is exposed directly, for conductive contact with the panel, the adhesive defining a regular repetitive pattern along the length of the seal in a proportion of substantially 5% to 40% adhesive area, to 60% to 95% exposed area.

**18**. The apparatus according to claim **17**, wherein the plurality of areas of adhesive define a broken pattern of spaced lines on the conductive surface.

**19**. The apparatus according to claim **17**, further comprising a release liner removably attached to the conductive surface via the adhesive.

**20**. The apparatus according to claim **17**, wherein the conductive surface is defined by a conductive sheath on a compressible core.

**21**. The apparatus according to claim **17**, wherein the conductive surface is defined by a flexible conductive sheet.

**22**. An apparatus for shielding against passage of electromagnetic energy through an abutment of conductive panels, comprising:

a seal body of indefinite length, having a conductive surface disposed on a compressible element;

an adhesive disposed on the conductive surface, the adhesive being discontinuous along said length of the seal body, thereby defining a plurality of areas of adhesive, for attaching the seal body to at least one of said panel, separated by areas wherein the conductive surface is exposed directly, for conductive contact with the panel, and wherein the adhesive is substantially nonconductive.

5,105,056

**13**

23. A method for mounting a seal against passage of electromagnetic energy through an abutment of conductive panels, comprising the steps of:

    providing a seal body of indefinite length, having a conductive surface;

    applying an adhesive to the surface, the adhesive being discontinuous along said length of the seal body, and defining a plurality of areas of adhesive in a regular repetitive pattern along the length of the seal, for attaching the seal to at least one said panel, separated by areas wherein the conductive sheath is exposed directly, for conductive contact with the panel, the areas of adhesive and the areas exposed being provided in a proportion of substantially 40% adhesive area to 60% exposed area;

    attaching the seal via said adhesive to one of said conductive panels;

    bringing the panels into abutment with the seal interspersed, whereby conductivity between the panels includes a conductive path from the panels directly to the exposed areas of the conductive surface.

24. The method according to claim 23, comprising applying the adhesive such that the plurality of areas of adhesive define spaced dots on the surface of the conductive sheath.

**14**

25. The method according to claim 23, further comprising attaching a release liner to the adhesive conductive sheath via said adhesive, and removing the release liner before attaching the seal to said one of the panels.

26. A method for mounting a seal against passage of electromagnetic energy through an abutment of conductive panels, comprising the steps of:

    providing a seal body of indefinite length, having a conductive surface;

    applying an adhesive to the surface, the adhesive being a nonconductive hot metal adhesive applied in a discontinuous pattern along said length of the seal body, and defining a plurality of areas of adhesive in a regular repetitive pattern along the length of the seal, for attaching the seal to at least one said panel, separated by areas wherein the conductive sheath is exposed directly, for conductive contact with the panel;

    attaching the seal via said adhesive to one of said conductive panels;

    bringing the panels into abutment with the seal interspersed, whereby conductivity between the panels includes a conductive path from the panels directly to the exposed areas of the conductive surface.

* * * * *