## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PARKER-HANNIFIN CORPORATION and PARKER INTANGIBLES, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SCHLEGEL ELECTRONIC MATERIALS, INC., <br><br> Defendant. | : <br> : <br> : <br> : <br> : C.A. No. 1:07-cv-00266-MPT <br> : <br> : <br> : <br> : <br> : |
| SCHLEGEL ELECTRONIC MATERIALS, INC., <br><br> Counterclaimant, <br><br> v. <br><br> PARKER HANNIFIN CORPORATION, <br><br> Counter-Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

### PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
### DEFENDANT'S MOTION TO ENFORCE A SETTLEMENT AGREEMENT

        CONNOLLY BOVE LODGE & HUTZ, LLP
        Rudolf E. Hutz (#484)
        Francis DiGiovanni (#3189)
        Steven A. Nash (PA #85707 - admitted *pro hac vice*)
        The Nemours Building
        1007 N. Orange Street
        Wilmington, DE 19899
        Phone: (302) 658-9141
        rhutz@cblh.com
        fdigiovanni@cblh.com
        snash@cblh.com

        Attorneys for Plaintiffs Parker-Hannifin Corporation, and Parker Intangibles, LLC

Dated: June 16, 2008

## TABLE OF CONTENTS

**PAGE(S)**

I. INTRODUCTION ...................................................................................................................1

II. LEGAL STANDARDS .........................................................................................................2

III. ARGUMENT.........................................................................................................................3

    A. The April 10 Letter, Viewed Objectively ........................................................3

    B. Schlegel's Assertions With Respect To The April 10 Letter .........................3

    C. The April 10 Letter Is Missing Important Terms ............................................4

    D. The Missing Terms Are Important ....................................................................7

IV. CONCLUSION....................................................................................................................12

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Asten, Inc. v. Wangner Systems Corp.*,
   1999 WL 803965 (Del. Ch. Sept. 23, 1999)..................................................................10

*In re Enstar Corp.*,
   Civ. A. No. 7802 (Del. Ch. Jan. 31, 1989) ........................................................................2

*Intellisource Group, Inc. v. Williams*,
   1999 U.S. Dist. LEXIS 12446 (D. Del. Aug. 11, 1999) ..................................................10

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
   1997 WL 208955 (Del. Ch. Apr. 22, 1997) .......................................................................5

*Leeds v. First Allied Connecticut Corp.*,
   521 A.2d 1095 (Del. Ch. 1986) .........................................................................................2

*Liquor Exchange, Inc. v. Tsaganos*,
   2004 WL 2694912 (Del. Ch. Nov. 16, 2004) ....................................................................2

*Ramone v. Lang*,
   2006 Del. Ch. LEXIS 71 (Del. Ch. Apr. 3, 2006) .............................................................7

*Roberts Enters., LP v. Fun Sport, Inc.*,
   2008 U.S. Dist. LEXIS 18522 (D. Del. Mar. 7, 2008) ......................................................2

*Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*,
   1993 Del. Ch. LEXIS 182 (Del. Ch. Aug. 27, 1993) ........................................................9

*Tiernan v. Devoe*,
   923 F.2d 1024 (3d Cir. 1991) ............................................................................................2

*Wilcher v. City of Wilmington*,
   139 F.3d 366 (3d Cir. 1998) ..............................................................................................4

**OTHER AUTHORITIES**

R.H. Stern, *Post-Sale Patent Restrictions After Mallinckrodt—An Idea In Search Of Definition*, 5 ALB. L.J. SCI. & TECH. 1 (1994) ............................................................6

**TREATISES**

R. ELLIS, A TREATISE ON THE LAW OF PATENT ASSIGNMENTS AND LICENSES,
   § 281 (1936)........................................................................................................................6

Plaintiffs Parker-Hannifin Corporation and Parker Intangibles, LLC (hereinafter "Parker"), hereby submit their Brief in Opposition to Defendant's Motion to Enforce a Settlement Agreement (hereinafter "Motion") filed by Defendant and Counterclaimant, Schlegel Electronic Materials, Inc. (hereinafter "Schlegel").

## I. INTRODUCTION

Parker filed this action in May 2007 in the good faith belief that Schlegel was infringing Parker's patents-in-suit.[1] However, information produced in February and March 2008 during the course of discovery raised significant issues as to Schlegel's infringement of Parker's patents-in-suit within the United States. Accordingly, Parker believed it to be in the best interest of both parties to settle the litigation, which now involved counterclaims alleging infringement by Parker of several Schlegel patents.

Parker thereupon contacted Schlegel for the purpose of engaging in settlement negotiations. *See, e.g.,* Motion, Ex. B. Schlegel responded by demanding a payment from Parker of $350,000 and a license to end the litigation. *Id.* Schlegel represented to Parker on April 4, 2008 that it desired a license so that it would not "have to deal with the patents every time we improve or change one of our products." Motion, Ex. D at 2. Thus, it was understood that the purpose of the license was to alleviate Schlegel's fear of another lawsuit over improvements or modifications to Schlegel's products. This understanding was confirmed in Parker's email to Schlegel of April 23, 2008. Motion, Ex. J. At that time Parker also noted that the scope of the license was still subject to negotiation, and specifically that Schlegel could "add any additional Schlegel products." *Id.*

---

[1] Parker's patents-in-suit are U.S. Pat. No. 6,248,393, U.S. Pat. No. 6,387, 523, U.S. Pat. No. 6,521,348, U.S. Pat. No. 6,716,536, and U.S. 6,777,095. The patents relate to advances in flame retardant electromagnetic interference shielding gaskets.

Schlegel now asks this Court to interpret a letter sent by Parker on April 10, 2008, as a binding offer that contains all essential terms so as to form a contract upon acceptance. This Court should refuse Schlegel's request for the reasons that follow.

## II. LEGAL STANDARDS

Motions to enforce settlement agreements are similar to motions for summary judgment. *See Tiernan v. Devoe*, 923 F.2d 1024, 1031-32 (3d Cir. 1991) ("The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in litigation."). Thus, the same standard of review is applied: Courts "must treat all the non-movant's assertions as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Id*. at 1032 (citation omitted). Summary judgment cannot be granted in favor of the movant "unless there is no genuine issue of material fact." *In re Enstar Corp.*, Civ. A. No. 7802, 1989 Del. Ch. LEXIS 10, at *11 (Del. Ch. Jan. 31, 1989) (applying summary judgment standard to settlement contract) (citation omitted), *rev'd on other grounds*, 604 A.2d 404 (Del. 1992).

A contract is formed when the parties intended to be bound on all of the terms that they regard as important. *Roberts Enters., LP v. Fun Sport, Inc.*, 2008 U.S. Dist. LEXIS 18522, at *6 (D. Del. Mar. 7, 2008). A contract is considered sufficiently definite when the agreement is clear and unambiguous and no essential terms are missing. *Liquor Exchange, Inc. v. Tsaganos*, 2004 WL 2694912, at *2 (Del. Ch. Nov. 16, 2004). If an essential term is missing, then the court is prohibited from granting specific performance on the contract. *Id.*

In determining whether the parties intended to be bound, the Court should not attempt to determine the subjective state of mind of either party. *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986). Instead, the determination should be based on the ordinary meaning of the language employed in writings, the course and substance of

2

negotiations, prior dealings between the parties, and customs or practices in the industry. *Id.* Under this objective theory of contract law, the unexpressed, subjective intention of a party is irrelevant. *Id.*

"Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative." *Leeds*, 521 A.2d at 1102.

### III.   ARGUMENT

#### A.   The April 10 Letter, Viewed Objectively

Parker's letter to Schlegel of April 10, 2008 proposed a basic framework for further negotiations. In essence, the aim was to further the ongoing settlement talks by (1) addressing Schlegel's demand for $350,000 from Parker, and (2) offering to extend a license to Schlegel under the Parker patents beyond Schlegel's currently-marketed products. Motion, Ex. E. The second aim arose from Schlegel's fear of later being sued under the Parker patents if Schlegel "improve[d] or change[d] one of [its] products." Motion, Ex. D at 2. To this end, the letter of April 10 proposed a cross license to all past, present, and future-marketed products. The intention of the proposal was to overcome considerable differences between the parties on the settlement issue, and to act as the starting point for further negotiations as to what the binding scope of the license would ultimately be. The April 10 letter *did not* propose that the license be unrestricted, or purport to be a compendium of all essential terms of that license. As would be appreciated by a reasonable person with experience negotiating a patent license and as was consistent with the prior course of dealing between these parties, there were numerous essential terms and conditions which remained to be negotiated.

#### B.   Schlegel's Assertions With Respect To The April 10 Letter

Schlegel alleges that it understood the April 10 letter to offer a "*fully unrestricted* cross license." Motion at 9 (emphasis added.) In other words, Schlegel asserts that Parker, in

3

addressing Schlegel's fear of future litigation over "improvements" or "changes" to its products, proposed an absolute, unfettered, and unrestricted license. Under Schlegel's view the alleged agreement would permit Schlegel, one of Parker's chief competitors, to use Parker's patented technology to double, quadruple or even further expand its U.S. sales volume. If that were not enough, Schlegel would evidently have the right to grant sublicenses to other competitors of Parker or otherwise to transfer the technology to them, such as by acquisition or merger, giving Schlegel the ability to literally flood the market with "licensed" products. Any of these circumstances would significantly harm Parker's sales of competing products, and would deprive Parker of the competitive advantage to which it is entitled under the patent laws. Such a "fully unrestricted" license was never offered by Parker, and no such intent could be objectively inferred from the April 10 letter.

### C. The April 10 Letter Is Missing Important Terms

Schlegel points to Parker's letter of April 10, 2008 as definitive of all important or essential terms of the proposed cross-license. Motion at 3-4, Ex. E. Schlegel also implies that Parker's email of April 14, 2008 constitutes an admission that the parties agreed to all important terms by characterizing the status of their negotiation as an "agreement in principle." Motion at 2, 4, 10, note 42. That email, however, did not include any terms. Motion, Ex. A. Moreover, an "agreement in principle" does not imply that the parties have agreed to all important or essential terms, or that a contract has been established. *See, e.g.*, *White v. Fleet Bank of Maine*, 875 A.2d 680 (Me. 1995) ("Agreements in principle are generally considered 'agreements to agree,' and are distinguished from enforceable agreements."); *Wilcher v. City of Wilmington*, 139 F.3d 366, 373 (3d Cir. 1998) (no enforceable agreement found where parties "agreed in principle" to a stipulation halting the activities complained of, but did not discuss the "details" of the agreement); *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *8-9 n.3 (Del.

4

Ch. Apr. 22, 1997) (alleged agreement in principle will only be enforced when "the parties . . . have reached an agreement on all material terms.") Thus, Parker's April 10 letter is the only source of the alleged essential terms as a matter of law.[2]

The April 10 letter stated, in the entirety of its relevant portion:

> In order to address your client's concern regarding the uncertainty of future litigation, Parker proposes the following. The parties exchange mutual releases from liability in connection with the subject matter of the lawsuit, and dismiss all claims and counterclaims with prejudice. *In addition, the parties grant to one another paid-up cross-licenses under the patents-in-suit covering all past, present and future-marketed products.* This compromise should alleviate Schlegel's concern over any lingering uncertainty about future disputes.

Motion, Ex. E (emphasis added).

The scant size of the lone relevant paragraph—and lone sentence addressing licensing—should on its own give the Court pause when considering whether the April 10 letter contained all important terms. *See Leeds*, 521 A.2d at 1102-03 (a reasonable commercial negotiator in a complex transaction would not normally conclude that a single page letter constitutes a binding contract.) The short length of the letter and its single relevant paragraph make it particularly easy to identify important or essential terms that are not present. Some of these are listed below:

- The definition of licensed "products."[3]

---

[2] Schlegel contends that Parker's assent to certain revisions proposed by Schlegel between the April 22 and April 28 draft agreements indicates a meeting of the minds on several terms. Motion at 5-6, 11. During this time, Parker was providing drafts that as a whole would have been acceptable to Parker. The terms added by Schlegel to the April 22 draft would have been acceptable had Schlegel agreed to the additional terms added by Parker in the April 28 draft. Without an agreement on the entirety of the draft, Schlegel's added terms are without context or meaning. As discussed in section D, *infra*, there could have been many different terms, in different combinations, to which Parker would have agreed. What Parker would not agree to was Schlegel's unreasonable demand for a fully unrestricted license.

[3] The language set forth in Parker's April 10 letter, "all past, present and future-marketed products" was included to address Schlegel's fear of future litigation over "improvements" or "changes" to it current products. The language was intended to expand the scope of the license beyond currently-marketed products, but never to give an unqualified, "fully unrestricted"

- The number of units or sales volume to be licensed.

- Field of use terms.

- Territorial scope of the license.

- Whether or not the license is sublicenseable.

- Whether or not the license is assignable.

- Whether or not the license is personal, or inures to the benefit of a successor in interest.

- The circumstances, if any, under which the license rights may be transferred.

- Enforcement of the patents against third parties.

- Representations, warranties, and indemnification provisions.

- Where and by what means disputes would be resolved.

The above list identifies only a few of the terms that were missing from the April 10 letter and remained open for further negotiation. These and other terms have long been typical of patent licenses, and a reasonable person reading the April 10 letter would have recognized that they were missing. *See, e.g.*, R.H. Stern, *Post-Sale Patent Restrictions After Mallinckrodt—An Idea In Search Of Definition*, 5 ALB. L.J. SCI. & TECH. 1, at 41 (1994) ("Ordinarily, the agreement would be a license agreement with a licensee, providing that the other person's manufacture, use, and sale of a product ... covered by the patentee's patent shall be subject to a given limitation, condition, or restriction."); R. ELLIS, A TREATISE ON THE LAW OF PATENT ASSIGNMENTS AND LICENSES, § 281 (1936) ("The general rule is that the licensor may impose any condition he desires, both positive and negative.").

Further, the proposed cross-license would have involved twice the number of issues as a standard unilateral license grant. In addition to Schlegel taking a license to the Parker patents on

---

license to unlimited quantities of every conceivable product. Rather, patent licenses routinely include a definition of licensed products to which the licensee will be restricted.

6

unknown terms, Parker would have been taking a license under the Schlegel patents. The specific rights that Parker would acquire under this license were also unspecified.

In summary, Parker's April 10 proposal was, at most, an "agreement to agree." Missing many important and essential terms, a reasonable reader would have understood it to be non-binding and subject of further negotiations.

### D.     The Missing Terms Are Important

No binding agreement has been reached because the above-noted missing terms are important and essential. *See Ramone v. Lang*, 2006 Del. Ch. LEXIS 71, at *35 (Del. Ch. Apr. 3, 2006) (no enforceable agreement found where the parties never reached a complete meeting of the minds on all material terms.)

Schlegel requests that this Court enforce the alleged agreement without any of the missing terms in an obvious attempt to obtain an unprecedented windfall. Until now, Schlegel has not been able to increase its market share of gaskets that it sells in the United States. Without use of Parker's technology protected by the Parker patents, it is believed that Schlegel must load the foam core of certain of its gaskets with flame retardant additives to achieve a V0 rating from Underwriter's Laboratories. Such loading causes the Schlegel gaskets to lose resiliency over time, and renders them undesirable for many applications. The technology claimed in the Parker patents solves this problem. Accordingly, Parker and its legitimate licensees have enjoyed a strong commercial advantage over Schlegel and a larger market share.

As they would have it, Schlegel would be permitted to flood the market with competing products and wreak havoc on Parker's market share. However, reasonable terms—as Parker tried to negotiate before Schlegel cut off negotiations in favor of filing the Motion—would preserve much of the advantage that Parker now enjoys. Any such terms (e.g., a definition of "products" as found in most licensing agreements, an overall volume limitation, volume limits

for particular products, terms regarding the field of use on all or particular product types, or territorial considerations) could have been the subject of the contemplated further negotiations.

Such reasonable terms and conditions are especially important given information of which Parker only recently became aware. Specifically, Parker recently learned that Schlegel acquired UL certification for V0-rated gaskets that are believed to be sold overseas. Absent any restrictions or conditions on a license, Schlegel could immediately start importing these gaskets into the United States in unlimited numbers.

Of course, a reasonable limit on the licensed products and/or the number of sales is only one of many important terms that are missing from the April 10 letter. Other missing terms include whether or not the license would be personal, transferable, sublicenseable, assignable, etc. A license for Schlegel alone to use the patented technology at its now-existing facilities would be far different than a license under which Schlegel could employ the technology at newly acquired facilities, or one in which Schlegel could transfer the license rights to others.

The missing terms of the alleged agreement would have potential deleterious effects on Schlegel as well. Would Parker (who Schlegel now accuses of overreaching "against a smaller adversary," Motion at 11) have the right to acquire Schlegel's competitors and transfer Schlegel's own patented technology to them without any limitation or restriction? Surely this is not what Schlegel intended when it claims to have thought the April 10 letter represented a "fully unrestricted cross license." However, similar to many essential terms of the alleged agreement, the question remains open.

The April 10 letter and Schlegel's alleged "agreement" address none of these issues. Instead, a reasonable person reading the April 10 letter would have understood that a final agreement was subject to negotiations on these and other points listed above.

Similar facts were presented to this Court in *Roberts Enterprises,* 2008 U.S. Dist. LEXIS 18522. There, the plaintiff brought a motion to enforce an alleged settlement agreement conferring a trademark license on the defendant. *Id.* at *3. The defendant argued that there was no enforceable agreement because the parties never agreed on an essential term, namely territorial exclusivity. The Honorable Judge Farnan agreed with the defendant, explaining that territorial exclusivity was an essential term given the amount of money involved and the obligations attendant with a licensing agreement. *Id*. at *6.

Similarly, the Court of Chancery has held that no contract existed in the sale of an ongoing business because essential terms were lacking. *Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*, 1993 Del. Ch. LEXIS 182, at *53-57 (Del. Ch. Aug. 27, 1993). Essential terms agreed upon during negotiations included price, form of payment, structure of transaction, cancelability of long-term contracts, disposition of the wireline interest, and the closing date. *Id.* at *49. However, missing essential terms relating to representations, warranties, indemnities, and due diligence procedures were found sufficient to prevent the formation of an enforceable agreement. *Id*. at *53. As in *Telephone & Data Systems.*, none of these issues were addressed in the April 10 letter.

Likewise, in *Wilcher,* plaintiff firefighters sued the City of Wilmington to permanently halt direct observation of drug testing. 139 F.3d at 372. The parties "agreed in principle" to a stipulation permanently halting the direct observation procedure, but did not discuss the "details" of the agreement. *Id*. at 373. The Court of Appeals for the Third Circuit affirmed the District Court's denial of a permanent injunction, characterizing the agreement in principle as "but one step of a complex negotiation" and finding no binding contract because the agreement in principle failed to incorporate essential terms. *Id*. at 373. As in *Wilcher*, the agreement in

principle between Parker and Schlegel was merely a step in the negotiation process, with missing essential terms to be determined through further negotiations.

In *Intellisource Group, Inc. v. Williams*, 1999 U.S. Dist. LEXIS 12446 (D. Del. Aug. 11, 1999), Plaintiff sued to enforce an alleged settlement agreement regarding the repurchase of company stock. *Id*. at *13. The plaintiff and defendant had agreed to the price and number of shares, and in accepting the defendant's offer, the plaintiff indicated that "the purchase money can be available by October 15, 1998." This Court held that no contract existed because the plaintiff's statement was not an agreement on payment terms, which was essential in such a complex transaction. *Id*. at *13. The Honorable Judge Robinson explained that the defendant seeking to enforce the agreement failed to meet his burden of showing that the phrase "purchase money" meant the entire purchase price. In the instant case, the large number of missing terms are far more important to the alleged agreement than was the payment schedule missing in *Intellisource Group.*

In all of the above cases, material or essential terms were missing and no enforceable agreement was found to exist. In all of the above cases, the parties had reached agreement in principle on about the same or far more terms than had Parker and Schlegel in the present case. One simply cannot find a case in which an alleged settlement "agreement" as scant as the April 10 letter was enforced.

The principal case on which Schlegel relies in its Motion is *Asten, Inc. v. Wangner Systems Corp.*, 1999 WL 803965 (Del. Ch. Sept. 23, 1999). In that case the parties had signed a formal cross-licensing agreement following four days of mediation. *Id.* at *1. The sole "essential" term that plaintiff argued was missing related to a likely conveyance of the patent rights to third parties in exchange for payments in-kind. *Id.* at *2. During the negotiations, the

10

issue of cash payments for such conveyances had been addressed, incorporated into the formal agreement, and signed by the parties. *Id.* It stated "that the patent rights will be jointly licensed to third parties with the proceeds thereof generally divided 80% to Asten and 20% to Wangner." *Id.* The court acknowledged that the agreement did not expressly mention payments in-kind, but stated that the parties agree "to work out a more detailed plan for implementing such arrangement during the next two weeks." *Id.* Both parties believed upon signing the formal agreement that they had reached a final, binding agreement. *Id.*

Applying South Carolina law, the *Asten* Court found that the intent of the parties was clear from the signed agreement—80% of the proceeds of third party licensing are to go to Asten, and 20% are to go to Wangner. *Id.* at *3. Further, the court found that only minor difficulty would arise if a third party licensee swaps in-kind consideration (e.g., intellectual property or equipment) instead of cash in exchange for the license. *Id.* Despite this minor administrative issue, the intent of the parties to split the proceeds generally 80/20 was clear, and the unresolved detail as to how to effect the split of in-kind consideration did not constitute the omission of a material term. *Id.*

Putting aside the issue that *Asten* was decided under South Carolina and not Delaware law, the facts are distinguishable from those of the present case. Where in *Asten* the parties signed a complete, formal agreement, here Schlegel relies on a single sentence from a negotiation letter. Where in *Asten* only one minor detail was alleged to be a missing essential term and was in fact addressed in the signed agreement, here the letter upon which Schlegel relies was devoid of virtually all terms that would normally be negotiated in a patent license. Where in *Asten* it was clear that the parties intended to split proceeds generally 80/20 and only the question of *how* remained, here the parties are far apart on a multitude of issues, for example,

11

Schlegel's demand for a fully unrestricted license and Parker's desire for reasonable terms and conditions, e.g., on licensed products or sales volume.

Because Schlegel and Parker had agreed on nothing more than a framework on which to base further negotiations, and little else, *Asten* is inapposite. Rather, the more relevant cases of *Roberts Enterprises* and others cited above should be applied, and no enforceable agreement should be found.

## IV.    CONCLUSION

For the reasons set forth above, Parker respectfully submits that the alleged settlement agreement between Parker and Schlegel is missing numerous important and essential terms. These terms include: the definition of licensed "products"; the number of units or sales volume to be licensed; the field of use; territorial scope; sublicenseability; assignability; whether the license is personal, or inures to the benefit of a successor in interest; transferability; enforcement; representations; warranties; indemnification provisions; and dispute resolution. Under Delaware law, the above missing terms are important and essential, and no enforceable agreement has been formed. Thus, Parker respectfully requests that the Motion be denied.

        Respectfully submitted,

        CONNOLLY BOVE LODGE & HUTZ, LLP

By:   */s/ Francis DiGiovanni*
      Rudolf E. Hutz (#484)
      Francis DiGiovanni (#3189)
      Steven A. Nash (PA #85707 - admitted *pro hac vice*)
      The Nemours Building
      1007 N. Orange Street
      Wilmington, DE 19899
      Phone: (302) 658-9141
      rhutz@cblh.com
      fdigiovanni@cblh.com
      snash@cblh.com

Dated: June 16, 2008         Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

  I, Francis DiGiovanni, hereby certify that on June 16, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, and copies were caused to be served upon the following counsel of record via electronic mail:

George Pazuniak<br>
Anna Martina Linnea Tyreus<br>
James Michael Lennon<br>
Womble Carlyle Sandridge & Rice<br>
222 Delaware Avenue<br>
Wilmington, Delaware 19801

        */s/ Francis DiGiovanni*
        Francis DiGiovanni (#3189)