# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PARKER-HANNIFIN CORPORATION, :
and PARKER INTANGIBLES, LLC,          :
                                                          :
                          **Plaintiff,**           :
                                                          :
          v.                                          :          **Civil Action No 1:07-cv-266-MPT**
                                                          :
SCHLEGEL ELECTRONIC                    :
MATERIALS, INC.,                             :
                                                          :
                          **Defendant.**        :
_____ :
                                                          :
SCHLEGEL ELECTRONIC                    :
MATERIALS, INC.,                             :
                                                          :
                          **Counterclaimant,**  :
                                                          :
          v.                                          :
                                                          :
PARKER-HANNIFIN CORPORATION, :
                                                          :
                          **Counter-Defendant.** :
_____ :

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF
## ITS MOTION TO ENFORCE A SETTLEMENT AGREEMENT

Dated: June 26, 2008

WOMBLE CARLYLE SANDRIDGE
  & RICE, PLLC

George Pazuniak (#478)
James M. Lennon (# 4570)
Anna Martina Tyreus (# 4771)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

*Attorneys for Schlegel Electronic Materials Inc.*

# TABLE OF CONTENTS

I.   Summary of Factual Dispute ................................................................................. 1

II.  Summary of Legal Dispute ................................................................................. 1

III. Argument .......................................................................................................... 2

   **A.**   Parker's April 10th Offer Letter Constituted an Offer
           Which Schlegel Accepted to Form a Contract ............................................. 2

   **B.**   April 10th Offer Letter Was Unrestricted In Scope ....................................... 4

   **C.**   No Essential Terms Were Missing ............................................................... 5

IV.  Conclusion ...................................................................................................... 8

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Master Maintenance and Const. Inc.*,
  452 F.3d 373, 379 (5th Cir. 2006) ............................................................................. 2

*Exigent Technology, Inc. v. Atrana Solutions, Inc.*,
  442 F.3d 1301, 1312 (Fed. Cir. 2006) ....................................................................... 2

*Leeds v. First Allied Connecticut Corp.*,
  521 A.2d 1095 (Del. Ch. 1986) ................................................................................. 2

*Lynch, Inc. v. SamataMason Inc.*,
  279 F.3d 487, 489 (7th Cir. 2002) ............................................................................ 2

## Statutes

Del. Code Ann. Tit. 6, §2-206 ........................................................................................ 3

## Other Authorities

MATTHEW BENDER & CO., INC.,
  1-1,1-2 PATENT LICENSING TRANSACTIONS (2008) ......................................... 5, 6, 7

Defendant and Counterclaimant, Schlegel Electronic Materials, Inc. ("Schlegel") hereby replies in support of its Motion to Enforce a Settlement Agreement ("Motion") against Plaintiff and Counter-Defendant, Parker-Hannifin Corporation and Parker Intangibles, LLC ("Parker").

## I.  Summary of Factual Dispute

Parker questionably alleges that it discontinued the litigation because Schlegel was not infringing Parker's patents.[1]  Parker admits it "contacted Schlegel for the purpose of engaging in settlement negotiations," and, after weeks of negotiation, on April 14, 2008, Parker memorialized an agreement by email:

> This is to confirm our telephone discussion today.  The parties have in principle reached an agreement on settlement in accordance with my letter of April 10.  We will suspend the e-discovery production (due today) in favor of finalizing the details of the agreement.  Parker will provide to you a draft agreement shortly.[2]

The April 10th letter referenced in this email contains all of the essential terms thereby making the parties' agreement binding.  Only the typical standard clauses found in any licensing agreement needed to be written, as the parties subsequent conduct reinforced.[3]

Simply put, even with all disputed facts resolved in favor of Parker, the only objectively reasonable interpretation of the parties' express language is that the parties formed a binding agreement on all essential terms to the settlement Schlegel seeks to enforce through its motion.

## II.  Summary of Legal Dispute

Parker wrongly suggests that "agreement in principle" is somehow a term of art for an

---

[1] Plaintiffs' Answering Brief In Opposition To Defendant's Motion To Enforce A Settlement Agreement (hereinafter "D.I. 42"), p. 1.  Parker's suggestion that it sought settlement and issued its covenant not to sue in light of non-infringement revelations is disingenuous at best.  To date, Schlegel has focused little effort on non-infringement because Schlegel discovered and produced to Parker considerable invalidity and unenforceability evidence, including a deposition exposing the extent of Schlegel's prior art activities in March 2008.  Schlegel's prior art and inequitable conduct evidence appears to have motivated Parker to get Schlegel out of litigation before these revelations infect Parker's litigations against Seiren and Zippertubing.

[2] Exhibit A to Defendant's Memorandum In Support of Its Motion To Enforce A Settlement Agreement (D.I. 38)) (hereinafter, "D.I. 38, Ex. A").

unenforceable "agreement to agree."[4]  Parker also errs in its heavy reliance on Chancellor

Allen's decision in *Leeds v. First Allied Connecticut Corp,*[5] and the other cases it cites,

which are distinguishable because they point to at least one required and essential term

missing from the parties purported agreement that was not otherwise implied by conduct or

custom.  In any event, as Chancellor Allen  stated, "a discussion of cases holding whether a

particular negotiation resulted in (or did not culminate in) a contract is of limited

guidance" because every case turns on a different set of facts.[6]

## III.  Argument

### A.    Parker's April 10th Offer Letter Constituted an Offer Which Schlegel Accepted to Form a Contract

Parker argues that its April 10th letter to Schlegel merely "proposed a basic

framework for further negotiations."[7]  That is plainly wrong, because the letter was a classic

offer, exactly of the type taught in entry contract law classes.  Parker's April 10th letter expressly

stated that it was Parker's "current <u>offer</u>" and then made threats "if Schlegel rejects the current

<u>offer</u>…."[8]  Viewed objectively, the April 10th letter is an offer to settle the case under the essential

terms described therein, which included "paid-up cross-licenses under the patents-in-suit covering

---

[3] *See, e.g.,* the parties final redline document exchanged on April 28, 2008, D.I. 38, Ex. G.

[4] *See Acosta v. Master Maintenance and Const. Inc.,* 452 F.3d 373, 379 (5th Cir. 2006)("The District Court so held because, prior to removal, Appellants had signed a letter evincing an *agreement in principle* to settle their claims against the LIG defendants, and the state court had granted the parties' joint motion to sever the LIG defendants from the ongoing litigation.")(*emphasis added*); *Exigent Technology, Inc. v. Atrana Solutions, Inc.,* 442 F.3d 1301, 1312 (Fed. Cir. 2006) ("Atrana points to a number of factors that suggest that the *Agreement in Principle* Term Sheet did not constitute an enforceable agreement. … In contrast, Exigent argues that all the essential terms had been agreed upon and therefore, even if some open issues remained for negotiation, the term sheet was still enforceable. If in fact the essential terms were not agreed to by the parties, there was no enforceable agreement.  … we reverse the district court's order … and remand for further proceedings. In these further proceedings, the district court should articulate its grounds for finding the agreement either enforceable or unenforceable.") (*emphasis added*); *Lynch, Inc. v. SamataMason Inc.,* 279 F.3d 487, 489 (7th Cir. 2002) ("[A]ccording to the magistrate judge's recollection, which the parties do not question, at that conference the parties "reached an *agreement in principle* to resolve the litigation" by a written settlement agreement. After the conference they exchanged a number of drafts of the agreement.") (*emphasis added*) (*Holding*: plaintiff, who did not request that settlement agreement reached in conference be recorded, was bound by judge's recollection of agreement's terms.).

[5] 521 A.2d 1095 (Del. Ch. 1986).

[6] *Id.* at 1103, n.5.

[7] D.I. 42, p. 3.

[8] D.I. 38, Ex. E.

_**all**_ past, present and future-marketed products."[9]  There is no ambiguity in this statement as to

whether the license covered _all_ future-marketed products.  The words are plain and simple.

Although the present settlement agreement is not governed by Delaware's Uniform Commercial

Code, it is noteworthy that this Delaware law would clearly characterize the letter as an offer

inviting acceptance:

> § 2-206.  Offer and acceptance in formation of contract.
>
> (1) Unless otherwise unambiguously indicated by the language or circumstances
>
> (a) an offer to make a contract shall be construed as inviting acceptance in any
> manner and by any medium reasonable in the circumstances * * * *[10]

Parker's suggestion that, subjectively, it intended to restrict the scope of the license with

respect to future developments must be rejected, because that was not part of the written offer that

Schlegel accepted.  Objectively, Parker's written language manifested an offer to grant a license

to all future developed products.  Parker's choice of words are the only relevant measure as to the

intended scope of the license.  In any event, even if doubt could creep into an objective reading of

this language, it would be extinguished by the proceeding sentence: "This compromise should

alleviate Schlegel's concern over _any_ lingering uncertainty about future disputes."  Plainly, _all_

uncertainty could not have been removed if Parker intended to later narrow the scope of its

license with respect to future developments.

Schlegel then accepted this offer verbally in an April 14th phone conversation.[11]

Schlegel's acceptance of Parker's offer, which formed the enforceable agreement is undisputed,

and, indeed, Parker's counsel was quick to create written record of what he himself called an

"agreement" in an email sent that same day.  Parker would surely have sought to use this written

memorial of the agreement against Schlegel had it been Schlegel and not Parker with a change of

---

[9] _Id_. (_emphasis added_)
[10] Del. Code Ann. Tit. 6, §2-206.
[11] Again, by analogy, the Delaware UCC provides offers general invite acceptance in any reasonable manner.  Del.

heart on the deal. And lawyers, in particular, know the significance of the words they choose and the reason to record them.

### B.    April 10th Offer Letter Was Unrestricted In Scope

Parker's April 10 letter offered an *unrestricted* cross license. Parker disingenuously argues it is unfathomable that it would offer "an absolute, unfettered, and unrestricted license" to Schlegel, "one of Parker's chief competitors, to use Parker's patented technology to double, quadruple or even further expand its U.S. sales volume." The point is irrelevant, because the issue is whether the unrestricted offer was made and accepted, and not whether it made sense. But, moreover, Parker's Covenant not to sue is expressly "an absolute, unfettered, and unrestricted license" to Schlegel, "one of Parker's chief competitors, to use Parker's patented technology to double, quadruple or even further expand its U.S. sales volume."[12] Therefore, Parker's own conduct betrays its words.

Parker then alleges it had not intended to license Schlegel to use a non-V-0 foam in an otherwise V-0 rated gasket and that "reasonable terms and conditions are especially important given information of which Parker only recently became aware . . . that Schlegel acquired UL certification for V0-rated gaskets that are believed to be sold overseas."

Parker's argument that the asserted activity is somehow relevant is wrong on two fundamental grounds. First, the point begs the question whether Parker offered an unrestricted license which Schlegel accepted. Second, Parker's argument ignores the fact that Schlegel has been marketing essentially the same EMI gasket products in the U.S. for over a decade. Thus, Schlegel's Profile Selection Guide ("Guide")[13] explained that "[m]any profiles are available with resilient fire retardant (V-O) foam and are recognized UL 94 V-0 under the component program

---

Code Ann. Tit. 6, §2-206.

[12] D.I. 38, Ex. M, p.2.

[13] D.I. 38, Ex. H, p.3. "Profile" means a particular shape for Schlegel's fabric-over-foam EMI gaskets, the only type of gasket sold by Schlegel.

of Underwriters Laboratory, Inc."[14]  The Guide further provided that Schlegel offers foams that are both non-V-0 rated (indicated as "type 1" or "HB"[15] foams) and V-0 rated (indicated as "type 5" and "type 6" foams).[16]

Thus, Parker's argument about allegedly new Schlegel products is legally erroneous in light of the plain language of Parker's offer, and is factually deficient.[17]

### C.    No Essential Terms Were Missing

Parker argues that the conciseness of the paragraph on licensing in its April 10th offer letter somehow proves that it did not intend to be bound by the language in that paragraph. Schlegel does not ask this Court to find any more to the agreement than what is contained in that letter.  Once the Court is persuaded that the April 10th letter and April 14th emails objectively manifest an intent to be bound to reasonably certain terms therein, the burden must shift to Parker to demonstrate that there were, in fact, other essential terms that the parties had not and did not agree upon.  Parker's mere laundry list suggestion that other material terms might have existed, all of which are defined by custom in the absence of express reference, does nothing to prove what essential terms the parties still needed to negotiate. Delaware UCC and treatises of patent licensing provide that an accepted offer need not include every detail.[18]

---

[14] *Id.*  Many copies of the Guide, which included the above quoted language, were produced to Parker last year.

[15] "HB" refers to a horizontal burn test, while "V-0" refers to a more stringent vertical burn test.

[16] Parker is correct that earlier this year, Schlegel offered for sale in the U.S. some new products designations, including "type 7" foams that have not been UL tested but go into otherwise V-0 rated gaskets.  However, Parker, Schlegel and all other companies in the business regularly update their product offerings, and these new product designations were disclosed in electronic discovery to Parker.

[17] In fact, this is not the first time that Parker started rethinking its agreement.  As shown in D.I. 38, Ex. F, p.13, as part of its renege of the settlement agreement, Parker attempted to limit Schlegel's licensed products to only "type 5" and "type 6" foams and exclude existing "type 1" foams.  Schlegel did not accept that attempted restriction of the settlement agreement, and, interestingly, after attempting to restrict the pro-forma written license to only certain foams, Parker then granted a Covenant as to all products made, used, sold, offer, or imported as of the time the Covenant, which is in direct contrast to its current arguments.

[18] Delaware's UCC provides:

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

§ 2-204(3).  Patent licenses receive no different treatment under the law.  *See* MATTHEW BENDER & CO., INC., 1-1 PATENT LICENSING TRANSACTIONS § 1.02 (2008) ("Since licenses are governed by general principles of contract law, informal letters, or a series of letters, may constitute a license agreement. The fact that the parties contemplate

Parker's accepted offer was reasonably certain and provided a basis for an appropriate remedy. The other terms of the agreed-upon license, which Parker argues are "missing" and "essential", are standard provisions typically found in any license. They were inherent in the offer and the acceptance. Taking each of Parker's laundry items in order:

(1) "The definition of licensed "products." Parker errs in arguing that the licensed products were undefined, because the accepted offer covered ***all*** past, present and future-marketed products.

(2) Specific volumes, fields of use, territories. Again, these terms were unnecessary because the accepted offer covered ***all*** past, present and future-marketed products.[19]

(3) "Whether or not the license is sublicenseable [or] … assignable [generally or to a] successor in interest [or] transferable." The well-established law is that, absent a specific right to assign or sublicense, a non-exclusive patent licensee has no right to assign or sublicense the license.[20] In this case, the accepted offer did not include any such rights, and, therefore, none were included. The absence of such rights in the accepted offer, or that the parties might later agree to limited assignability, does not make the offer and acceptance incomplete or indefinite.

(4) "Enforcement of the patents against third parties." Again, non-exclusive licensees have no right to enforce patents or even to participate in the patentee's enforcement actions, and, therefore, any omission of the obvious does not make the offer and acceptance incomplete or indefinite.[21]

---

a more formal contract will not deprive a letter agreement of its legal effectiveness.") (*internal citations omitted*).
[19] *See also* MATTHEW BENDER & CO., INC., 1-1 PATENT LICENSING TRANSACTIONS § 2.01 (2008) ("In the absence of an express provision to the contrary, the right granted under the license will be assumed to be geographically coextensive with the territorial limitations of the patent.") (*internal citations omitted*); *Id.*, § 2.01 ("Absent an express provision to the contrary, the licensee may produce under the license to the extent desired ….") (*internal citations omitted*).
[20] *Id.*, § 2.04 ("As a general rule, a patent license is personal and not transferable, unless the terms of the agreement manifest an intent to permit assignment.") (*internal citations omitted*); § 2.05 ("It has generally been held that rights arising under patent licenses are not divisible, and that a licensee may not grant sublicenses unless he is authorized to do so by the terms of the license.") (*internal citations omitted*).
[21] *Id.*, § 1.01 ("The general rule is that a nonexclusive licensee does not have the right to sue for infringement.") (*internal citations omitted*); § 2.06 ("Absent an express covenant requiring enforcement of the licensed patent rights,

(5) "Representations, warranties, and indemnification provisions." The accepted offer did not include any representations, warranties or indemnifications, and, therefore, any confirmation that no such representations, warranties or indemnifications were made does not make the offer and acceptance incomplete or indefinite.[22]

(6) "Where and by what means disputes would be resolved." The accepted offer did not include any provisions for dispute resolution, and, therefore, there was no such agreement. Dispute resolution, however, is not an essential term of any agreement, and, absent subsequent agreement, disputes would ultimately be handled by the applicable courts, just as with any other dispute.[23] The absence of this non-essential term did not make the offer and acceptance incomplete or indefinite.

Parker's April 22nd and redlined April 28th documents confirm that Parker's April 10th offer, which Schlegel accepted, did not lack any essential terms.[24] These documents demonstrate that Parker reneged on the agreed-upon offered and accepted scope of the license, but, otherwise, the terms of the formal settlement agreement were inconsequential matters, often saying nothing more than the obvious. Parker can not prove that its accepted offer was indefinite or incomplete, by the circular reasoning that the accepted unrestricted offer should have been restricted.

In sum, Parker offers the Court many reasons for why its April 14th and April 10th communications do not manifest an intent to be bound to the essential terms therein, but they are neither objective nor reasonable given the plain language Parker choose and its prior and subsequent conduct. Denying what is in essence summary judgment against Parker under these

---

there is no obligation on the part of the licensor to protect the licensee against competition from infringers.") (*internal citations omitted*).

[22] *Id.*, § 2.03 ("In general, there exists no implied warranty by the licensor that the licensed invention has commercial utility. Likewise, the licensor does not impliedly warrant that the licensed patent is valid. Further, there is no implied warranty by the licensor that the licensed invention does not infringe any patents which may be the property of third parties.") (*internal citations omitted*).

[23] *Id.*, § 2.17 ("…if no proof is tendered as to the law of the chosen jurisdiction, the court is free to apply its own conflict rules.") (*internal citations omitted*).

[24] D.I. 38, Ex. G.

circumstances is not just.

## IV.  Conclusion

In light of the foregoing analysis of facts and law, Schlegel respectfully requests that the Court grant its Motion to enforce the parties' April 14, 2008 license and settlement agreement.


Dated:  June 26, 2008

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
*A Professional Limited Liability Company*

/s/  *James M Lennon*
George Pazuniak (#478)
James M. Lennon (# 4570)
Anna Martina Tyreus (# 4771)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Tel:  (302) 252-4326
Fax:  (302) 661-7726
gpazuniak@wcsr.com
jlennon@wcsr.com
mtyreus@wcsr.com

*Attorneys for Schlegel Electronic Materials, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **PARKER-HANNIFIN CORPORATION,** | : | |
| **and PARKER INTANGIBLES, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No 1:07-cv-266-MPT** |
| | : | |
| **SCHLEGEL ELECTRONIC** | : | |
| **MATERIALS, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |
| | : | |
| **SCHLEGEL ELECTRONIC** | : | |
| **MATERIALS, INC.,** | : | |
| | : | |
| **Counterclaimant,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PARKER-HANNIFIN CORPORATION,** | : | |
| | : | |
| **Counter-Defendant.** | : | |
| _____ | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2008, a copy of the foregoing ***DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO ENFORCE A SETTLEMENT AGREEMENT*** was electronically filed with the Clerk of the Court using CM/ECF and was served on the following counsel of record for Plaintiff by email:

> Steven N. Nash (SNash@cblh.com)
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE  19899

This 26th day of June, 2008.

*/s/  James M. Lennon*_____
James M. Lennon (DE # 4570)